## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIFFANI M. SHAFFER, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | No: 19-1481 |
| | ) | |
| v. | ) | District Judge Christy Criswell Wiegand |
| | ) | |
| CRANBERRY TOWNSHIP, | ) | **ELECTRONICALLY FILED** |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

### DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

AND NOW, comes Defendant, CRANBERRY TOWNSHIP, by and through its attorneys, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, TERESA O. SIRIANNI, ESQUIRE and MORGAN M. J. RANDLE, ESQUIRE and files the within Brief in Support of Motion for Summary Judgment, as follows:

### I.    SUMMARY OF ARGUMENT

Cranberry Township respectfully seeks judgment in its favor on each Count of Ms. Shaffer's Complaint.  At Counts I and II, labeled as Sex and Pregnancy Discrimination under Title VII and the Pennsylvania Human Relations Act ("PHRA"), Ms. Shaffer fails to prove her prima facie case.  Even if the Court finds that Ms. Shaffer has met this initial burden, the Township has a legitimate non-discriminatory reason for Ms. Shaffer's treatment that Ms. Shaffer cannot show is pretextual for any discriminatory animus.  The Township worked extensively with Ms. Shaffer to provide her with light-duty work during her pregnancy based upon her expressed comfort level as well as her doctor's recommendations.  To the extent Ms. Shaffer worked less than her full-duty tenure, the same is attributable to the lack of light-duty work available for Ms. Shaffer.  Ms. Shaffer

additionally has not proven retaliation at Counts III and IV under Title VII and PHRA, because any changes to her duties were based upon her doctor's restrictions as to her pregnancy and her own self imposed limitations. Even if the Court were to find that Ms. Shaffer had evinced a prima facie case of retaliation, the Township's legitimate non-discriminatory reason for Ms. Shaffer's treatment is that she was provided all available work that fit within her restrictions. For these reasons the Township seeks judgment in its favor.

## II.        STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Anderson v. Liberty Lobby*, the Supreme Court held that the evidence creates a genuine issue of material fact only where it "is such that a reasonable jury could return a verdict for the nonmoving party … a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. 242, 248 (1986). An issue is "genuine" if a reasonable jury possibly could hold in the nonmovant's favor on that issue. *Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

To demonstrate that no material facts are in dispute, the moving party must show that the nonmoving party has failed to establish one or more essential elements of his or her case. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986*))*. ***A nonmovant's beliefs and/or speculations cannot defeat summary judgment***. *Lexington Ins. Co. v. Western Pa. Hosp.*, 423 F.3d 318, 332-33 (3d Cir. 2005) (emphasis added). A "scintilla of evidence is clearly inadequate to create a genuine issue of

material fact." *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 83, 103 (3d Cir. 1999). Moreover, evidence that is immaterial or irrelevant cannot defeat a motion for summary judgment. *Id.* at 97, 98. Finally, with regard to an issue on which the nonmovant has the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

III.   **ARGUMENT**

A.    **Ms. Shaffer has failed to establish sex and pregnancy discrimination.**

At Counts I and II of her Complaint, Ms. Shaffer asserts claims of sex and pregnancy discrimination under Title VII and the PHRA respectively.[1]  The Township addresses Ms. Shaffer's discrimination claims as disparate treatment claims.[2]

"Disparate treatment is a form of intentional employment discrimination; it occurs when an employer singles out a person or a group of employees and treats them differently than other employees who do not share the same protected classification."  *Ricci v. DeStefano*, 557 U.S. at 557.   A plaintiff alleging disparate treatment must show that her employer intentionally discriminated against her because she was pregnant. *Brown,* 2019 WL 1745653 at *5-6; *Young v. United Parcel Serv.*, 135 S.Ct. 1338 (2015). A plaintiff can demonstrate intentional discrimination

---

[1] When a plaintiff alleges violations of the PDA and PHRA, both claims are subject to the same Title VII analysis. *See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Smith v. Pathmark Stores, Inc.*, No. 97-1561, 1998 WL 309916, at *3 (E.D. Pa. June 11, 1998) ("Courts have uniformly interpreted the PHRA consistent with Title VII.").

[2] A pregnant employee may make a claim for discrimination by alleging either "disparate treatment" or "disparate impact" discrimination. *Brown v. Aria Health*, 2019 WL 1745653, *5-6 (E.D. Pa. 2019); *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009). Disparate impact, as opposed to disparate treatment, is a form of unintentional employment discrimination. *Brown,* 2019 WL 1745653 at *5-6. A pregnant worker alleges a disparate impact claim when she asserts that her employer's policies—although facially neutral—disproportionally affect pregnant workers. *See Id.; Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792, 798 (3rd Cir. 1991); *see also EEOC v. Metal Serv. Co*., 892 F.2d 341, 348 (3rd Cir. 1990). Unlike disparate treatment claims, which focus on the employer's intent, disparate impact claims focus on the effects of the employer's policies. *Id.* Since there is no light duty policy at issue in this case, the Township will address Ms. Shaffer's claims as disparate treatment claims.

through either direct or indirect evidence. *Id*. Evidence is direct when it "would prove the prohibited intent without resort to an inference or presumption." *U.S. Equal Employ. Opportunity Comm'n v. Bob Evans Farms*, LLC, 275 F.Supp.3d 635, 651 (W.D. Pa. 2017) (*citing Torre v. Casio, Inc*., 42 F.3d 825, 829 (3d Cir. 1994)). Evidence is indirect—or circumstantial—when an inference of intentional discrimination may be drawn. *Id*. at 652. If a plaintiff relies on indirect evidence to prove discrimination, the claim is "analyzed under the burden shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Kautz v. Met-Pro Corp*., 412 F.3d 463, 465 (3d Cir. 2005). As set forth by the Court in *Brown*:

> "To establish a prima facie case of pregnancy discrimination under the *McDonnell Douglas* framework, a plaintiff must show that: (1) she was pregnant; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) similarly situated individuals not in plaintiff's protected class were treated more favorably or there is a nexus between her pregnancy and the adverse employment action. *See Young*, 135 S.Ct. at 1353–54, *Laverty v. Drexel Univ*., No. 14-5511, 2016 WL 245307, at *6 (E.D. Pa. Jan. 21, 2016). This framework "is not intended to be an inflexible rule.... Rather, an individual plaintiff may establish a prime facie case by showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII." *Young*, 135 S.Ct. at 1353–54 (internal citations omitted) (internal quotations omitted). Once a plaintiff has established a prima facie case, the burden then shifts to the employer to articulate some "legitimate, non-discriminatory reason for its actions." *Id*. at 1354. If the employer satisfies this burden, the burden shifts to the plaintiff to demonstrate that the employer's proffered reasons are pretextual. *Id*.

*Brown v. Aria Health*, 2019 WL 1745653, *6 (E.D. Pa. 2019). "The difference between pregnancy and sex discrimination claims is that pregnancy discrimination claims require an employer's knowledge, or an inference of knowledge, of pregnancy." *May v. PNC Bank*, 2020 WL 370043 at *5 (*citing Turevsky v. FixtureOne Corp*., 904 F. Supp. 2d 454, 463 (E.D. Pa. 2012)). As to the fourth prong, *Young* requires a plaintiff to establish that an employer accommodated others "similar in their ability or inability to work." *Young*, 135 S.Ct. at 1342. The *Young* Court also highlighted that:

The Court *doubts that Congress intended to grant pregnant workers an unconditional "most-favored-nation" status*, such that employers who provide one or two workers with an accommodation must provide similar accommodations to all pregnant workers, irrespective of any other criteria. After all, the second clause of the [Pregnancy Discrimination] Act, when referring to nonpregnant persons with similar disabilities, uses the open-ended term "other persons." It does not say that the employer must treat pregnant employees the "same" as "any other persons" who are similar in their ability or inability to work, nor does it specify the particular "other persons" Congress had in mind as appropriate comparators for pregnant workers. Moreover, disparate-treatment law normally allows an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has a legitimate, nondiscriminatory, nonpretextual reason for doing so.

*Id*. (emphasis added)(internal citations omitted).

This initial prima facie burden lies solely with Ms. Shaffer. "A disparate impact theory of discrimination requires the plaintiff to put forth evidence (facts or statistics) demonstrating that the challenged employment practice has a disproportionately negative effect upon members of the protected class"—here, pregnant women. *See Tex. Dep't Hous. Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,* 135 S. Ct. 2507, 2523 (2015) ("A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."); *Adams,* 742 F.3d at 733 (affirming the dismissal of disparate impact claim and stating that the amended complaint lacked "factual material to move the disparate-impact claims over the plausibility threshold[ ]"); *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996) ("In order to establish a prima facie case of disparate impact, a plaintiff must first isolate and identify 'the specific employment practices that are allegedly responsible for any *observed* statistical disparities.'") (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994 (1988) (emphasis added)).

### 1.   *Ms. Shaffer has not established a prima facie case*

a.   Prong Three - Adverse Employment Action

To establish an adverse employment action, a plaintiff must show that he or she experienced:

> [A] tangible employment action constitut[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.... A tangible employment action in most cases inflicts direct economic harm.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998); *see also Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir.2004) (defining an adverse employment action as "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment").

Here in the instant case, the Township respectfully submits that Ms. Shaffer did not suffer an adverse employment action as compared with other police officers who also received modified or light duty. The evidence in this case confirms and Ms. Shaffer does not dispute that she was granted light duty work. Exhibit "F", Ms. Shaffer's Answers to Defendant's First Set of Interrogatories, pp. 2-3. Rather, Ms. Shaffer claims that she did not receive the same amount of light duty that was provided to other light duty officers including hours and duties. *Id.* Moreover, it appears that Ms. Shaffer is claiming that she should have had a full 40 hours of light duty every week and if not a full 40 hours, then a set schedule of light duty. Ms. Shaffer's claims in this regard are simply not grounded in fact or in law.

In fact, the Township provided Ms. Shaffer with light duty work at her request to the extent it was available and within her doctor's restrictions – the same as every other officer who received light duty. Indeed, the timesheets of the light duty officers reflect that Ms. Shaffer was right in line in hours of light duty worked during the period of the respective officers' restrictions. During Kobistek's light-duty period between February 2015 and April 2016, he worked approximately 400 hours. Ex. O, K. Meyer's Deposition, 182:1-183:19; Ex. U, Kobistek's Timesheets. Shields

worked approximately 200 hours in two and a half months in 2015. Ex. O, K. Meyer's Deposition, 184:2-185:6; Ex. S, Shields' Timesheets. Roberts worked 500 light duty hours over a year and four months. Ex. O, K. Meyer's Deposition, 184:2-185:6; Ex. T, Roberts' Timesheets. Similar to each of these individuals, and at times more frequently than the other employees, Ms. Shaffer worked over 400 hours during her approximately six month light-duty period. Ex. O, K. Meyer's Deposition, 182:1-183:19; Ex. W, Ms. Shaffer's Timesheets.

Moreover, there is no indication in the historical record in this case that Ms. Shaffer did any duties that were different from other light duty officers and to the extent the light duty work was available at the time and based on the length of the officers' respective length of restrictions. There is no evidence in the record that any officer on light duty was paid to come in to work when no light duty work was available. In large part, it appears that Ms. Shaffer believes she could do the following light duty tasks: monitor the radio, take phone call requests, attend court, conduct PICS investigations, handle walk-ins, help other officers on reports, burn DVDs for DUI cases, fingerprinting, overtime detail and possibly assist with records management. *See generally*, Ex. F; Ex. L. Ms. Shaffer's Deposition 24:13-25:1.

As to attending Court and conducting PICS investigations, Ms. Shaffer could not effectuate an arrest nor be in uniform, making these tasks contradictory to her doctor's recommendations. As to burning DVDs for DUI cases, Chief Meyer declined to allow Ms. Shaffer to do so because it requires special permissions that Ms. Shaffer did not have and that the Chief was not comfortable providing based on her limited amount of time on the job. Ex. O, K. Meyer's Deposition, 139:12-140:22. Ms. Shaffer has not presented evidence that other patrol officers handled burning DVDs while on light duty. As to fingerprinting, Ms. Shaffer was allowed to do civil and criminal fingerprinting until the Chief realized that criminal fingerprinting could involve taking individuals

into custody, and based upon her doctor's list of appropriate duties and Ms. Shaffer's own comfort level, would not be allowed.  As to overtime detail, Ms. Shaffer has not presented evidence that other patrol officers received the same on light duty.  Ex. L, Ms. Shaffer's Deposition 102:17-103:3.  As to records management system work, prior light duty officers conducted this work in the Department's office but it was not available during Ms. Shaffer's light duty because the Department had completed the changeover between systems.  Had it been available, the Chief would have also assigned Ms. Shaffer the work.  For the remaining tasks, taking radio calls, phone call request, walk-ins and generally assisting, Ms. Shaffer did in fact perform these during her light duty.

Moreover, it is undisputed that the Township did not have any light duty policy and that there was no requirement under any bargaining contract to provide light duty.  The Township is not aware of any law or case that required the Township to provide Ms. Shaffer a full 40 hours of light duty every week as she contends especially absent a policy or a contract.  To the extent she claims that the Township should have provided her with a set schedule throughout the entirety of her period of light duty similarly has no basis in the law especially considering the nature of the patrol officer's job.  Even considering the types of light duties that police officers could work in the Department such as handling walk ins, phone calls and the like, such light duty work could obviously not be predicted or planned.  This notion was echoed by the other officers that Ms. Shaffer deposed in this case and even Ms. Shaffer could not come up with a list of light duty jobs that would have kept her busy for 40 hours per week every week throughout the time of her light duty.  Accordingly, the Township did the same as it had done for all other officers needing the accommodation of light duty in the past – which was to accommodate each officer to the extent possible with available light duty work that fit within each respective officers' medical restrictions.

While the Township acknowledges that any reduction in hours, even if arguably *de minimus* (recognizing the Third Circuit case of *EEOC v. Bob Evans Farms, LLC*, 275 F. Supp 3d 635 (W.D. Pa 2017)), could on its own constitute an adverse employment action under Title VII, the same cannot be considered in a vacuum.  Every officer to whom the Township provided light duty in this case experienced reduced hours while on light duty because there was nothing guaranteeing that light duty work would be available on a full time basis especially in this line of work and considering each officer's individual restrictions including Ms. Shaffer.  The Township could only provide light duty work to the extent it was available at the time.  There is no evidence that Ms. Shaffer was treated differently in this regard.  Despite her contention that she should have been allowed to sit in the Department's office and wait for light-duty work to become available, there no basis in the law for demanding a set schedule of 40 hours per week where the work is not available.  Other light duty employees did not receive such set schedules of 40 hours per week, and their hours fluctuated just as Ms. Shaffer's did.  The Chief worked tirelessly to identify tasks and duties that Ms. Shaffer could perform within her doctor's recommendations, as well as her own comfort level that went above and beyond her doctor's recommendations.  Other than conclusory allegations that she lost hours and thus compensation, even Ms. Shaffer cannot identify light-duty tasks that she could have performed that suited her specific restrictions.

To extent Ms. Shaffer responds duties that she believes other patrol officers were assigned during light duty, she cannot rely on speculation of subjective beliefs to overcome summary judgment.  "Speculation alone cannot establish a prima facie case of discrimination." *See Bray v. L.D. Caulk Dentsply Int'l*, No. 98-441, 2000 WL 1800527 at * 5 (D. Del. July 21, 2000);  *Eason v. Del Monte Foods*, No. 04-1968, 2006 U.S. Dist. LEXIS 65543, at *9 (W.D. Pa. Sept. 14, 2006)

("Speculations, generalities, and gut feelings, however genuine, do not allow for an inference of discrimination to be drawn when they are not supported by specific facts.")

Simply put, any change to Ms. Shaffer's hours of employment was a result of light duty work not being available and/or that met her restrictions.  There is no evidence that the Township intentionally reduced her hours.  Other than the above, Ms. Shaffer has been unable to identify what work would have kept her busy for forty hours a week during light duty.  For these reasons Ms. Shaffer has failed to establish an adverse employment action.

b.   Prong Four - Comparators

It is Ms. Shaffer's burden to identify her comparators who were treated more favorably.  On this issue, the Third Circuit has relatively minimal case law that has interpreted *Young* since *Young* was decided in 2015, forcing the Township to look to other Circuits for guidance.

The Eleventh Circuit addressed *Young's* comparator implications in *Durham v. Rural/Metro Corporation*, 955 F.3d 1278, 1286-7 (11th Cir. 2020).  In *Durham* the Court addressed the fourth prong of a prima facie case:

> We have explained that *Young's* analysis of the prima facie case's fourth prong means that, in contrast to Title VII's more general comparator analysis, "the comparator analysis under the PDA focuses on a single criterion—one's ability to do the job." *Lewis v. City of Union City, Ga*., 918 F.3d 1213, 1228 n.14 (11th Cir. 2019) (*en banc*). Here, as in *Young*, Durham's temporary inability to lift more than 50 pounds and her colleagues' inabilities to lift more than 10 or 20 pounds rendered Durham, and her colleagues injured on the job, equally unable to perform the 100-pound lifting duties of an EMT. Thus, Durham and her colleagues who were injured on the job were "similar in their ability or inability to work." Also, Rural's Employee Handbook also left open the possibility that Rural similarly accommodated some of those disabled off the job, including those with resulting lifting restrictions. For these reasons, Durham has satisfied the fourth prong of her prima facie case.

The key differential between *Durham* and the instant case is that Ms. Shaffer has not met her burden of proving that her alleged comparators were similar in their ability or inability to work.

To the contrary, Ms. Shaffer has largely speculated as to her "comparators'" disabilities, and cannot express what limitations, if any, were provided by those officers' respective doctors. She appears to claim that Officers Shields, Roberts, Kobistek, Evanson, Weleski and Sergeants Irvin and Ahlgren are possible comparators, contending that these individuals were given a set schedule to sit in the office and wait for phone calls and walk-ins and worked more hours than she received.[3]

To the extent Ms. Shaffer compares herself to Sergeant Irvin, he did not work light duty. Sergeant Irvin took Family Medical Leave Act leave and returned to full-duty after completion of the same. *See* Exhibit "G" (CT_1203-4). Even if Irvin had worked light-duty, he was a ranking officer at the time of his leave such that he cannot serve as a legitimate comparator to Ms. Shaffer, who was a new patrol officer when she went on light-duty. There are significant distinctions in workload and work tasks between patrol officers and ranking officers whom typically have high caseloads requiring extensive paperwork. The same is true of any comparison to Sergeant Ahlgren. When Sergeant Ahlgren took light duty he was a Patrol Sergeant which was a particularly document intensive role that required Ahlgren to handle many duties that required experience, extensive training and time on the job, that Ms. Shaffer simply did not have. Ex. O, K. Meyer's Deposition, 88:10-93:9. Likewise, Officer Weleski had a substantial caseload, including working on the Records Management System and he returned to work without restrictions within two weeks of his injury in May 2017. Ex. Q, CT_1317.

To the extent Ms. Shaffer compares herself to Mark Shields, the two are also distinguishable such that Ms. Shaffer is not similar to him in all material respects. The fundamental job duties of Shields, who manages a large caseload of paperwork, differs from Ms. Shaffer's

---

[3] It is important to note that these individuals' doctors, not the employee, provided the Township with a list of the officers' work restrictions that they could or could not perform based on their respective injuries. Documentation regarding these individuals' injuries were handled through the Township's workers' compensation provider, whom then gave the Township instructions on handling.

11

position as a Patrol Officer.  Ms. Shaffer was not eligible to conduct detective level work because she did not have the requisite number of years with the Department. Even though Ms. Shaffer could not work in the Detective's office, the Chief specifically inquired of Sargent Irvin whether there was work that Ms. Shaffer could perform, and if any arose to let him know.  There simply was no such work.  In any event, Shields largely performed the same duties that Ms. Shaffer did while on light duty - monitor the radio, take phone call requests, PICS investigations, handle walk-ins, and help other officers on reports.  Shields did not always have 40 hours per week.  In fact, there was no light duty work for Officer Shields when he was initially released to return to work. The Township treated Ms. Shaffer and Shields in the same manner.

To the extent Ms. Shaffer compares herself to Officer Roberts, he also performed the same tasks as Ms. Shaffer.  Roberts was not provided a set schedule and was told that his time could change depending on work availability, the same as Ms. Shaffer.  Officer Evanson was not scheduled for a set 40 hours a week.  When Evanson was on light duty she had the same duties as Ms. Shaffer, with the addition of merging information between new records management software – a task that the Chief would have also assigned Ms. Shaffer had the work been available during her light-duty.  The same is true for Kobistek – he was not scheduled in advance for forty hours a week.  In fact, correcting and merging addresses in the Records Management System when the Department made a transition between software was Kobistek's primary focus while on light duty.

The Chief looked for every opportunity to provide Ms. Shaffer with work, met with her frequently to discuss available tasks and the moving target of what Ms. Shaffer was comfortable with doing in the workplace.  It is Ms. Shaffer's burden to show that she was treated differently than other employees within the Department.  Each of the comparators that Ms. Shaffer has

identified did the same tasks that Ms. Shaffer did while on light duty and there was no differential treatment.

### 2.       *Legitimate Non-Discriminatory Reason and Pretext*

It is the Township's position that since there was no adverse employment action against Ms. Shaffer as a matter of law that the Court respectfully does not need to evaluate whether the Township had a legitimate non-discriminatory reason for its treatment of Ms. Shaffer.  She was not treated differently than other light duty patrol officers such that the next step in the *McDonnell Douglas* framework need not be addressed.  To the extent Ms. Shaffer is going to argue that she was treated differently, each light duty employee of the Department was accommodated to the extent light duty work within their medical restrictions existed. Even if Ms. Shaffer establishes a prima facie case of pregnancy or sex discrimination, she proffers no evidence that the Township's extensive attempts to work with her regarding her schedule and permissible duties was pretext for discrimination.

In *Young*, the Court permitted the plaintiff to reach a jury where she provided sufficient evidence that an "employer's policies impose a significant burden on pregnant workers, and that the employer's "legitimate, nondiscriminatory" reasons were not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination." *Young*, 135 S.Ct. at 1354.  The *Young* Court found that a "plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." *Id*.  The Court reasoned that "if the facts are as Young says they are, she can show that UPS accommodates most nonpregnant employees with lifting limitations while categorically failing to accommodate pregnant employees with lifting

limitations. Young might also add that the fact that UPS has multiple policies that accommodate nonpregnant employees with lifting restrictions suggests that its reasons for failing to accommodate pregnant employees with lifting restrictions are not sufficiently strong—to the point that a jury could find that its reasons for failing to accommodate pregnant employees give rise to an inference of intentional discrimination." *Id*. at 1354-5.  Importantly, this particular ruling in *Young* is limited to the Pregnancy Discrimination Act, which is not a pled cause of action in the instant case. *See EEOC v. Catastrophic Management Solutions,* (852 F.3d 1018, 1025 (11th Cir. 2016)(The rationale and holding in *Young* are based on, and therefore limited to, the language in a specific provision of the PDA. *Young* is not, as the EEOC suggests, automatically transferable to a disparate treatment case under Title VII involving allegations of intentional racial discrimination."); *Verrett v. Johnson*, 2015 WL 5125202, *11 (E.D. La. 2015)(indicating that the approach described in *Young* is limited to the Pregnancy Discrimination Act).

The Township's legitimate non-discriminatory reason for Ms. Shaffer's treatment is that it provided her with all the work the she was qualified to do based on her tenure with the Department, and that fit within her doctor's restrictions, and her own comfort level.  The Chief kept an open line of communication with Ms. Shaffer regarding her changing abilities and the natural ebbs and flows of work within the office.  The Chief spoke with Sergeant Irvin about Ms. Shaffer helping in the Detective' office but that work wasn't available at the time. The Chief requested that Irvin let him know if there was any work available for Ms. Shaffer – for which none became available. The Chief gave Ms. Shaffer as much time as was available that met her restrictions.

It is unreasonable for Ms. Shaffer to demand 40 hours a week of light-duty work for which there was not work to do.  Ms. Shaffer is not, under the law, entitled to be compensated for not conducting work. The Chief provided her with all available light-duty work, and could not have

Ms. Shaffer sitting in the office waiting for infrequent walk-ins or phone calls.  Ms. Shaffer is also not entitled to sit in the office where there were two other individuals already performing clerical work.

The Third Circuit recently addressed a similar argument in *Maldonado-Torresv. Customized Distribution Services, Inc.,* 2020 WL 5645686 (E.D. Pa. 2020).  The defendant presented a legitimate non-discrimination reason for the pregnant plaintiff's termination in that she "could not physically perform her role as a warehouse operator, CDS could not afford to hire someone to assist her in completing her job duties in her role as warehouse operator, there were no light duty jobs available that met her medical restrictions, and she had exhausted her job-protected leave."  *Id*. at *8.  The Court ultimately determined that the *Maldonado* defendant took little steps to actually evaluate whether there was work available that could meet the plaintiff's medical restrictions such that the legitimate non-discriminatory explanation was unworthy of credence.  The facts of *Maldonado* fundamentally differ from those presented in the case at hand because Chief Meyer took extensive steps to accommodate Ms. Shaffer, had numerous open conversations about her comfort and ability to handle certain duties and was consistently reevaluating what light-duty tasks Shaffer could do during her pregnancy.

The Second Circuit sent a plaintiff's pregnancy discrimination claim under Title VII to a jury where a pregnant corrections officer sought a light duty accommodation, and the defendant county did not accommodate her but provided light duty accommodations to other employees who were similar in their ability or inability to work, namely, those who were unable to perform non-light-duty tasks as a result of injuries incurred on-duty.  *See Legg v. Ulster County*, 820 F.3d 67 (2nd Cir. 2016).  The facts of *Legg* are likewise distinguishable from the case at bar. In *Legg* the County responded that differential treatment of the plaintiff was based on a workers' compensation

scheme, or a neutral reason for providing benefits to employees injured on the job but not to pregnant workers. Doing so was contrary to *Young* and inconsistent with the County's evidence. Here, Cranberry Township provided light-duty to Plaintiff at every opportunity that it could, albeit, not with a set schedule or full-time hours per week. This case is not an issue of a Township not providing an employee with light-duty work – rather, Ms. Shaffer here complains that she was not given enough of that light-duty work, or provided a set schedule to her liking.

The Fourth Circuit has also addressed and interpreted *Young* since its ruling. In *Bray v. Town of Wake Forest*, 2015 WL 1534515 (E.D. N.C. 2015), at the motion to dismiss stage, the court allowed a disparate treatment claim under Title VII to move forward where a pregnant plaintiff was terminated based upon her doctor's medical restriction recommendations and where two male officers received light duty assignments when they experienced physical limitations as a result of injury. Again, the facts of *Bray* are significantly distinguishable from the instant case. Ms. Shaffer was not terminated, and Chief Meyer worked with her at every turn to make sure that she was given light-duty work.

The Township had a legitimate non-discriminatory reason for its treatment of Ms. Shaffer. The Township made its best efforts to accommodate Ms. Shaffer with light-duty work that fell within her doctor's recommendations as well as Ms. Shaffer's own expressed comfort. Ms. Shaffer cannot expect that the Department would keep her on the clock for 40 hours of time where there simply wasn't that much light-duty work to be completed. Despite Ms. Shaffer's vague contention that there was light-duty work to be completed beyond what she did, she has not provided any concrete examples and thus cannot establish that the Department's treatment of her was pretextual. For these reasons judgment should respectfully be entered in the Township's favor at Counts I and II.

16

B.      **Retaliation**

At Counts III and IV Ms. Shaffer avers retaliation under Title VII and the PHRA in relation to filing her EEOC Charge.[4] Ms. Shaffer fails to establish a prima facie case of retaliation, and even if she did, she cannot show pretext.

A prima facie case of retaliation requires a plaintiff to establish that "(1) she engaged in activity protected by Title VII; (2) the [Township] took an adverse employment action against her; and (3) there [is] a causal connection between her participation in the protected activity and the adverse employment action." *Harrell v. Solebury Township*, 2020 WL 833803, *10 (E.D. Pa. 2020) (citing *Hukman v. Am. Airlines, Inc*., No. 19-1934, 2019 WL 7369196, at *5, n.8 (3d Cir. Dec. 31, 2019)(quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

Ms. Shaffer cannot set forth any adverse employment action taken against her to support a prima facie case of retaliation at Counts III and IV. That Officer Shaffer contacted and/or filed an EEOC Charge at or about the same time she informed her employer of her work restrictions from her doctor does not automatically constitute retaliation.  The Township made extensive efforts to accommodate Ms. Shaffer and to provide her with light-duty work, for which she was eligible, to the maximum extent that it could.  Third Circuit law does not support that Ms. Shaffer is entitled to be paid for attending but not performing any work. The Township took the same actions and made the same attempts to accommodate Officer Shaffer as it had done absent her contact with the EEOC which is supported by the record in this case.  The Township's only goal was to keep Officer Shaffer working as much as possible and to give her as many hours as possible within her doctor's restrictions, as they would do and have done for any other officer at the Township.

---

[4] When a plaintiff alleges violations of the PDA and PHRA, both claims are subject to the same Title VII analysis. *See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Smith v. Pathmark Stores, Inc*., No. 97-1561, 1998 WL 309916, at *3 (E.D. Pa. June 11, 1998) ("Courts have uniformly interpreted the PHRA consistent with Title VII.").

To the extent Ms. Shaffer may argue that her duties were cut or reduced following the Township's notification of her EEOC Charge, Ms. Shaffer began to renege on the list of light duty work that she was comfortable performing during this time period.  Ms. Shaffer was allowed to do civil and criminal fingerprinting until the Chief realized there was a likelihood that she would have to take individuals into custody with criminal fingerprinting, and based upon her doctor's list of appropriate duties and Ms. Shaffer's own comfort level such work was not permitted.  The reason the Chief took PICS away from Ms. Shaffer was because he was uncomfortable with Ms. Shaffer being in court or in the field as she could not effectuate an arrest and was contradictory to her doctor's recommendations.  Importantly, despite Ms. Shaffer's claims, her hours worked actually *increased* through September following the July 26 meeting, at which time she invoked a provision of the Collective Bargaining Agreement requiring the Chief to give her two weeks' notice prior to any schedule change.  Exhibit "D" 2018 Paysheets.  By letter dated September 6, 2018, the Chief advised Ms. Shaffer that by invoking the two week provision it would limit his ability to schedule her to only assignments that could be done with two weeks advance notice.  Exhibit "K" September 6, 2018 Letter.  The Chief requested that Ms. Shaffer remain flexible so that he could get her maximum work, but by invoking this provision it specifically limited the Chief's ability to give her shorter notice assignments that may have fallen within her medical restrictions.

The Township was willing to accommodate and respect her wishes, but due to the structure and inherent dangers of working within a police department, could only provide her with a finite amount of light duty work based on her doctor's restrictions.  The Township certainly did not retaliate against her, and rather worked to accommodate her despite her changing self identified limitations, above and beyond those outlined within her doctor's recommendation. What is more, following Ms. Shaffer's return to full duty there is no evidence that her hours remained reduced.

No factfinder can reasonably infer that the Township retaliated against Ms. Shaffer based upon her EEOC Charge, let alone took any adverse employment actions against her, and The Township is entitled to judgment in its favor at Counts III and IV.

As detailed above, even if Ms. Shaffer is able to establish a prima facie case, Cranberry Township is able to establish a legitimate, non-pretextual and non-discriminatory reason for her work and treatment in employment, and Ms. Shaffer has failed to adduce any evidence to refute these reasons.  As such, Cranberry Township is entitled to judgment as a matter of law as to Ms. Shaffer's Title VII and PHRA retaliation claims.

### C.      The Township is Entitled to Summary Judgment on Ms. Shaffer's Claims for Punitive Damages.

Ms. Shaffer's claims for punitive damages must fail as a matter of law. It is well-settled that a municipality is immune from punitive damages. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Hafer v. Melo*, 502 U.S. 21, 25-26 (1991); *Smith v. Borough of Dunmore*, 633 F.3d 176, 183 (3d Cir. 2011). Ms. Shaffer is not entitled to punitive damages against the Township. Therefore, Ms. Shaffer's claims for punitive damages must be dismissed, with prejudice.

IV.     **CONCLUSION**

Based on the foregoing, Defendant Cranberry Township respectfully requests that this Honorable Court grant judgment in its favor pursuant to Rule 56.

Respectfully submitted,

**MARSHALL DENNEHEY**
**WARNER COLEMAN & GOGGIN**

BY:    _Teresa O. Sirianni_
TERESA O. SIRIANNI, ESQUIRE
PA ID # 90472
MORGAN M. J. RANDLE, ESQUIRE
PA ID #324470
**Counsel for Defendant, Cranberry Township**
Union Trust Building, Suite 700
501 Grant Street
Pittsburgh, PA  15219
(412) 803-1174
(412) 803-1188/fax
tosirianni@mdwcg.com
mmrandle@mdwcg.com

LEGAL/135415351.v1