IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIFFANI M. SHAFFER, | Civil Action |
| Plaintiff, | No.  19-1481 |
| v. | |
| CRANBERRY TOWNSHIP, | Judge Wiegand |
| Defendant. | JURY TRIAL DEMANDED |

**PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Tiffani M. Shaffer, by undersigned counsel, and pursuant to LCvR 56(C)(1)(c), files this Concise Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment as follows.

**I. Background**

1. Tiffani Shaffer graduated from the Indiana University of Pennsylvania Police Academy in November 2012. She then worked for the Butler County Sheriff's office from November 2012 to January 2017. While working for the Sheriff's office, she also worked for the Butler Community College campus police, and then as a patrol officer for Saxonburg Borough (Shaffer 8:19-10:10) Def. Ex. L [Doc. 40-12]).[1]

2. On January 9, 2017, Shaffer began working for Cranberry Township Police Department as a patrol officer (Meyer 17:7-13, Def. Ex. O [Doc. 40-15]; Shaffer 8:19-22; 10:5-7 [Doc. 40-12]).

3. On the same day, Cranberry Township Police Department hired its only other

---

[1] Defendant has included the majority of relevant evidence in its Appendix. Rather than refiling the same material, Plaintiff will cite to Defendant's appendix as "Def. Ex." Plaintiff will cite to additional documents in her own Appendix as "Plt. Ex." All deposition testimony is cited using the last name of the witness, followed by the applicable page and line numbers.

current female officer, Robin Mammarelli (Meyer 17:7-13 [Doc. 40-15]).

4. The Township employs 31 police officers, and three civilians that do clerical work in the office (Meyer 13:12-14; 16:3-15 [Doc. 40-15]).

5. Shaffer, like all police personnel, ultimately reported to Chief Kevin Meyer (Meyer 11:12-17, Def. Ex. O [Doc. 40-15]).

## II. Defendant's Light Duty Practices

6. Cranberry Township has no written policy for light duty or modified duty for patrol officers (Meyer 18:8-13 [Doc. 40-15]).

7. Police employees who have worked light duty include Officers Mark Shields, Jeffrey Kobistek, William Roberts, Rhonda Evanson, Michael Weleski; Sergeants Irvin and Ahlgren; and Chief Meyer[2] (Meyer 23:13-24:23, Def. Ex. O [Doc. 40-15]; *see also* Def. Ex. S-W [Docs. 40-19 through 23]).

**A. Officer Mark Shields**

8. In 2015, Officer Mark Shields had a work-related injury that made him unable to perform some of the essential functions of his job as patrolman (Meyer 34:10-16, Def. Ex O [Doc. 40-15]; Shields 7:12-19, 34:2-10, Def. Ex. P [Doc. 40-16]).

9. While on light duty, Shields was unable to perform arrests, fire a weapon, transport prisoners, pursue fleeing suspects, or lift a certain amount of weight (Shields 7:20-8:23).

10. At that time of his light duty, Shields was supervised by Chief Meyer and Sergeant Mascellino (Shields 5:24-6:7).

11. Prior to Shields being released to work light duty, Defendant's Human Resources

---

[2] Shaffer focuses here only on Officers Shields, Kobistek, Roberts, and Evanson. While the supervisory personnel were also treated more favorably than Shaffer, she need not identify them as comparators due to their heightened responsibilities. She also need not focus on Officer Weleski, given that he only worked light duty for two weeks. Notably, Officer Weleski worked forty-hour weeks for those two weeks. *See* Def. Statement of Facts ¶63.

Department described the following light duty activities to his physician's office:

- Handle and document telephone calls on station that would otherwise require a duty officer's response.

- Handle and document walk-in complaints that would otherwise require a duty officer's response. These can be handled through the reception window.

- Correct and merge addresses in the RMS.

- Conduct any relevant or required on-line training.

(Email re Mark Shields Dated 8/7/15, Plt. Ex. 5).

12. Shields' light duty work included listening to the radio and helping officers on the road (Shields 10:20-11:7); making call requests, *id.* at 11:8-12; working on PICS cases, *id.* at 11:13-12:4; assisting walk-ins, *id.* at 12:5-14, pre-populating information on other officers' reports, *id.* at 12:17-13:6, and doing civil fingerprinting, *id.* at 40:7-11.

13. Shields was permitted to attend court while on light duty (Meyer 37:10-15 [Doc. 40-15]).

14. Shields was able to keep himself busy while on light duty for 40 hours a week and contributed meaningful police work during that time (Shields 23:25-24:7 [Doc. 40-15].

**B. Officer William Roberts**

15. Officer Roberts was on light duty for work related injuries in both February 2013 and May 2015 (Meyer 41:11-13, 42:13-23 [Doc. 40-15]; Defendant's Supplemental Answers to Interrogatories No. 5, Plt. Ex. 3).

16. On both occasions, Roberts was unable to perform the essential functions of his job as patrolman (Meyer 45:14-17 [Doc. 40-15]).

17. Chief Meyer was involved in assigning the duties to Roberts in 2015 (Meyer 43:22-44:2; 47:9-13 [Doc. 40-15]).

3

18. On August 7, 2015, Chief Meyer sent Roberts a letter stating:

> You will be working 8am-4 pm, M-F in a light duty capacity, consistent with your release to return to work issued by PA [redacted] dated July 23, 2015. Your responsibilities will include answering phones and handling walk-in complaints as well as any other general office duties that can be completed in a sedentary fashion.

(Letter to W. Roberts dated August 7, 2015, Plt. Ex. 7).

19. During his light duty in 2015, Roberts answered phones, filled in for clerical staff, managed walk-in complaints, and assisted other officers (Meyer 47:17-48:9 [Doc. 40-15]).

### C. Officer Jeffrey Kobistek

20. Kobistek was first on light duty January 2015 to May 2015 (Meyer 58:8-12 [Doc. 40-15]; Kobistek Timesheets, Def. Ex. U [Doc. 40-21]).

21. On February 5, 2015, Defendant's Human Resources department sent Kobistek a letter, stating, *inter alia*:

> Given the information obtained from your physician, Chief Meyer has identified temporary light duties consistent with in your restrictions. Since you are not capable of performing the essential duties and functions of a police officer, even with reasonable accommodations, this job involves performing administrative duties such as handling and documenting calls on station that would otherwise require a duty officer's response, report filing, data entry, and corrections and merging addresses in the RMS.

(Letter to J. Kobistek dated February 5, 2015, Plt. Ex. 8).

22. On February 18, 2015, Chief Meyer distributed a memo stating that Kobistek would work Monday through Friday each week for four-hour shifts; and was permitted to handle phone calls, walk-in complaints, and merge addresses on the RMS computer system (Memorandum re Kobistek, Def. Ex. E [Doc. 40-5 at 2]).

23. While on light duty, Kobistek also focused on completing his in-service training (Meyer 67:3-10 [Doc. 40-15]).

24. Kobistek was on light duty a second time beginning January 2016. *See* Kobistek

Timesheets.

**D. Officer Rhonda Evanson**

25. Officer Rhonda Evanson sustained a work-related injury that made her unable to perform the full functions of a patrol officer (Meyer 76:22-77:7 [Doc. 40-15]).

26. On February 24, 2014, Chief (then-Lieutenant)[3] Meyer distributed a memo stating that Evanson would work Monday, Wednesday, and Friday from 8:00 am to 3:00 pm, and was permitted to handle phone calls, walk-in complaints, and merge addresses on the RMS computer system (Memorandum re Evanson, Def. Ex. E [Doc. 40-5 at 1]).

27. While on light duty, Officer Evanson corrected and merged addresses in the RMS system, and handled phone calls, documents, and walk-in complaints (Meyer [Doc. 40-15] 80:17-81:11).

### III. Officer Shaffer's Pregnancy and Request for Light Duty

28. On or around April 11, 2018, Shaffer told Stacy Goettler, Human Resources Manager, that she suspected she was pregnant, and inquired about a light duty policy (Shaffer 11:18-12:1, Def. Ex. L [Doc. 40-12]).

29. Goettler told Shaffer there was no light duty policy (Shaffer 12:15-18).

30. On or around May 14, 2018, Shaffer told Chief Meyer that she was pregnant (Shaffer 12:1-3).

31. Meyer said he would base any light duty assignments on what Shaffer's doctor recommended or restricted, when that time arose (Shaffer 15:9-17).

32. With Shaffer's approval, Goettler faxed Shaffer's doctor a list of essential duties, which was returned with her doctor's notes on it indicating what duties Sheffer could continue

---

[3] When Meyer was Lieutenant, there was no Chief of Police. He reported directly to the Public Safety Director. Since 2017, there has been no Public Safety Director (Meyer 10:21-11:11, 44:23-45:5).

performing on light duty (Goettler 19:20-20:20, Def. Ex. N [Doc. 40-14]; Shaffer 25:5-11 [Doc. 40-12]; Essential Duties List, Def. Ex. B [Doc. 40-2]).

33. The list of duties Shaffer was permitted to continue performing included: prepare investigative and other reports; interview and obtain statements from witnesses and suspects; attend court proceedings; endure verbal and mental abuse in an antagonistic environment; and process arrested suspects through taking photographs and fingerprints, among other duties. (Doc. 40-2 at 1-2).

34. During a phone call with Meyer and Goettler regarding the essential duties list, Meyer told Shaffer he would not permit her to do light duty hours in the office taking phone calls and walk-in complaints (Shaffer 63:22-64:5 [Doc. 40-12]).

35. However, the only times on light duty that Shaffer was permitted to handle phone calls and walk-in complaints was when she was scheduled to fill in for clerical staff while they were on vacation (Shaffer 65:9-66:7 [Doc. 40-12]).

36. During the same call, Meyer said that Shaffer could do Pennsylvania Instant Check System (PICS) investigation cases, civil and criminal fingerprints, and community policing events (Shaffer 63:1-17).

37. Shaffer was not given a set schedule with her light duty hours. Instead, Meyer often scheduled Shaffer to work with 24-48 hours advance notice (Shaffer 95:21-24; 150:2-11 [Doc. 40-12]). *See also* Emails, Def. Ex. H [Doc. 40-8] at 14, 34, 40, 57, 58, 64.

38. On July 2, 2018, Shaffer filed a charge of discrimination with the EEOC as a result of the limited working hours she was afforded compared to other officers previously on light duty (Original EEOC Charge and Inquiry, Plt. Ex. 10).

39. On July 13, 2018, Defendant received notice of Shaffer's EEOC charge (Def. Ex.

I [Doc. 40-9]).

## IV. Meeting on July 26, 2018

40.     On July 26, 2018, less than two weeks after the Township received notice of Ms. Shaffer's EEOC charge, Meyer, Goettler and Shaffer attended a meeting at Chief Meyer's request (Meyer 136:11-16, Def. Ex. O [Doc. 40-15]; Shaffer 93:6-10, Def. Ex. L [Doc. 40-12]).

41.     At the meeting, Meyer and Goettler asked Shaffer why she filed the EEOC charge, and what they could do to remedy it (Shaffer 93:11-16; Meyer 135:6-24).

42.     In response, Shaffer stated that the situation could be remedied if she received a set schedule as others had been given in the past, as well as 40 hours per week (Shaffer 93:21-94:3, 66:22-67:14).

43.     At the same meeting, Meyer explained that he would no longer allow Shaffer to do criminal fingerprinting, even though the list of approved essential duties from her doctor permitted fingerprinting (Meyer 148:14-149:2; Essential Duties List, Def. Ex. B [Doc. 40-2]).

44.     Meyer said that criminal fingerprinting was dangerous; however, there has never been a violent incident during fingerprinting that Meyer is aware of (Meyer 153:8-12).

45.     The June 22 letter approving light duty specifically stated, "you have been cleared to perform fingerprinting detail as it is scheduled" (Def. Ex. C [Doc. 40-3]).

46.     Meyer told Shaffer that he was previously able to give Shields full time duty because he had enough experience to work in the detective's office (Shaffer 34:12-22).

47.     Meyer testified that Shields' work in the detective's office included answering phones and handling walk-in complaints (Meyer 35:14-21).

48.     However, Shields has sworn that he did not work in the detective's office while on light duty (Shields Declaration ¶¶1-3, Plt. Ex. 2); *see also* Shaffer [Doc. 40-12] 33:19-34:4.

49. At the meeting, Shaffer asked Meyer if she could work with Corporal Och with burning DVDs per Och's request (Shaffer 76:1-4; Meyer 139:1-11).

50. Meyer later talked to Corporal Och, and decided not to allow Shaffer to burn DVDs, claiming she lacked the necessary experience (Meyer 139:12-140:2).

51. At the meeting, Shaffer asked Meyer if she would work in the detective's office, but he said she did not have five years of necessary experience (Shaffer 78:4-7; Meyer 144:8-15).

52. Meyer could have made an exception to the general practice that a patrol officer works for five years before being permanently placed in the detective's office (Meyer 144:14-145:8).

53. After the July 26 meeting, Meyer cut previously approved duties from Shaffer's workload, such as phone calls, walk-ins, fraud investigations, identity theft investigations, PICS cases, and criminal fingerprinting (Shaffer 109:6-13; 111:13-19).

54. Chief Meyer removed Shaffer's ability to take walk-in and phone call requests even on the days that she was already working in the receptionist's office. (Shaffer 111:13-112:2, Def. Ex. L [Doc. 40-12]; Shaffer's Answer to Interrogatory No. 4, Def. Ex. F [Doc. 40-6]).

55. Without the ability to take walk-ins, phone calls, fraud investigations, identity theft investigations, and PICS cases, Shaffer was also unable to continue performing other duties such as follow up investigations, and would no longer be permitted to attend court (Shaffer 111:23-112:2; 117:21-24).

56. Before the July 26 meeting, Shaffer worked an average of 29.7 hours each week for the first 5 weeks she was on light duty. *See* Doc. 40-23 at 3-7.

57. After the July 26 meeting, Shaffer worked an average of 14.9 hours each week for the remaining 21 weeks of her light duty. *See* Def. Ex. W (Doc. 40-23) at 8-28.

58.     After deducting the hours that Chief Meyer had already prescheduled for Shaffer before she filed her EEOC charge, Shaffer worked an average of 10.3 hours per week for the remaining 21 weeks of her light duty. *Compare id. with* Chief Meyer *Emails*, Def. Ex. H at 1.

### V. The two-week notice rule

59.     The Collective Bargaining Agreement ("CBA") between the Township and the police union provides:

> The Township shall post schedules for six (6) weeks of work at least two (2) weeks prior to the effective date of said schedule. Two weeks' notice shall be provided of any schedule changes, except in the case of an emergency or other circumstances beyond the Township's control.

(CBA Excerpt, ¶ 8.1(a), Plt. Ex. 9)

60.     In early September 2018, Shaffer contacted two people in the union about the two-week provision in the CBA (Shaffer 98:3-12 [Doc. 40-12]).

61.     The union individuals spoke to Chief Meyer, who agreed to follow the CBA by giving Shaffer two weeks' notice of her schedule (Shaffer 99:3-10 [Doc. 40-12]); September 6, 2018 Letter, Def. Ex. K [Doc. 40-11]).

62.     Shaffer believed that applying this provision would afford her a set schedule in advance (Shaffer 99:14-21).

63.     However, after raising the provision, the only days Shaffer was scheduled to work in advance were the days that the office staff were on vacation (Shaffer 99:22-100:4; *see also* Emails, Def. Ex. H [Doc. 40-8] at 1-5).

64.     Meyer discontinued calling Shaffer to fill in for employees who called off, even though the union sees this as acceptable practice and an exception to the two-week notice rule (Shaffer 146:4-147:8, Def. Ex. L [Doc. 40-12]); (Meyer 168:23-169:5, Def. Ex. O [Doc. 40-15]).

65.     In fact, adding shifts to Shaffer's schedule with less than two-week's notice is

9

permitted when the change is voluntary (Mascellino 44:16-23, Def. Ex. M [Doc. 40-13]).

66.     Officer Mark Shields had a different experience when invoking the two-week notice rule in the CBA. After he did so, he was scheduled 8 hours each day, 5 days each week, for the remainder of his light duty (Shields [Doc. 40-16] 30:14-15; 31:23-32:2; 37:20-24); *see also* Shields' Time Sheets beginning 11/15/2015, Def. Ex. S [Doc. 40-19] at 5-10).

67.     Shields' schedule was set every two weeks so that he knew in advance when he would be working (Meyer 40:3-11).

### VI. Comparison of light duty hours and duties

68.     Officers' time sheets show the hours that they actually worked, as well as hours that they took off due to vacation, sick, and comp time. If an officer takes vacation, sick, and comp hours, those hours were available for the officer to work, but the officer took off by choice (Shaffer Declaration ¶1, Plt. Ex. 1). All "available hours" referenced below reference hours actually worked, plus hours available but not used due to the officers' choice.

69.     While Shaffer was on light duty, she was not permitted to take sick time for hours she was not scheduled to work. Rather, she could only take sick time if she had to miss a scheduled day of work due to illness (June 22, 2018 Letter, Def. Ex. C [Doc. 40-3]; Goettler 26:13-23, Def. Ex. N [Doc. 40-14]).

70.     During Shaffer's 26.2 weeks of light duty, her available hours were an average of 16.7 hours per week per week. *See* Shaffer Time Sheets, Def. Ex. W (Doc. 40-23).

71.     During Shaffer's light duty period, there were four weeks where she was scheduled zero hours. *See* Doc. 40-23 at 13, 20, 25, 28.

72.     During Shaffer's light duty period, there were seven weeks where she was scheduled between two and eight hours. *See* Doc. 40-23 at 8, 14, 15, 16, 17, 19, 27.

73. No other officer on light duty was scheduled for zero hours in any week, other than while on leave or vacation. *See* Def. Ex. S through V (Doc. 40-19 to 22).

74. With the exception of Shields' first week of light duty, no other officer on light duty was scheduled for eight hours or less in any week. *See* Def. Ex. S through V (Doc. 40-19 to 40-22).

75. Shields was on light duty for nine weeks and had an available hours average of 35.8 hours per week. *See* Def. Ex. S (Doc. 40-19).

76. The beginning of Shields' light duty period overlapped with Officer Roberts' light duty period, during which he and Roberts each worked four-hour shifts five days per week (Shields 24:10-25:5, Def. Ex. P [Doc. 40-16]).

77. Once Shields' light duty stopped overlapping with Roberts' light duty, he was scheduled an average of 42.9 hours per week. *See* Shields Timesheets, Def. Ex. S (Doc. 40-19) at 4-10; *see also* Roberts Timesheets, Def. Ex. T, Doc. 40-20 (showing no hours as of November 8, 2015).

78. During Roberts' light duty period, his available hours were an average of 43.1 hours per week (Meyer 51:18-22 [Doc. 40-15]; Def. Ex. T [Doc. 40-20]).

79. During Kobistek's light duty period, his available hours were an average of 22.9 hours each week. *See* Def. Ex. U (Doc. 40-21).

80. Evanson was on light duty for 44.2 weeks and worked an average of 22 hours per week. *See* Def. Ex. V.

81. For the last 40 weeks of her light duty period, Evanson worked a set schedule of three seven-hour days. *See* Def. Ex. V (Doc. 40-22) at 9-48.

82. The light duty treatment of the various officers can be summarized as follows:

| Officer | Average Available[4] Hours per week | Total Hours | # of weeks | Lowest hours per week (non-vacation/ leave) | Set schedule? |
|---|---|---|---|---|---|
| Shaffer | 16.7 | Worked: 420.5 Time Used:[5] 16 436.5 Total | 26.2 | 0 | No |
| Evanson | 22 | Worked: 709 Time Used: 267= 976 Total | 44.2 | 10 | Yes |
| Kobistek | 22.9 | Worked: 382.5 Time Used: 125.5= 508 | 22.2 | 12 | Yes |
| Shields | 35.8 | Worked: 225.5 Time Used: 75= 300.5 Total | 8.4 | 8 (first week) / 20 otherwise | Yes |
| Roberts | 43.1 | Worked: 529.5 Time Used: 95= 624.5 Total | 14.5 | 11.5 (final week) 22 otherwise | Yes |

*See* Def. Ex. S-W (Doc. 40-19 to 23).

83. During the time that Shaffer was on light duty, there were 4 PICS cases available. (Def. Answer to Second Interrogatory No. 1, Plt. Ex. 4).

84. However, Shaffer was not permitted to work on PICS cases after the July 26 meeting (Shaffer 109:3-13, 117:14-24, Def. Ex. L [Doc. 40-12]).

---

[4] "Available" refers to the hours that the officers actually worked, plus the time they had available but chose to take off for sick, vacation, or comp time. It does not include off-duty holiday pay or medical leave.
[5] "Time Used" refers to sick, vacation, and comp time that the officers voluntarily used while scheduled for work. It does not include off-duty holiday pay or medical leave.

85. During the time that Shields was on light duty, he was assigned 4 PICS cases (Def. Answer to Second Interrogatory No. 2, Plt. Ex. 4).

86. Defendant has received more "calls" in its RMS system each year since 2015, as follows:

> 2015 (Shields, Roberts, Kobistek light duty): 15,204
>
> 2016 (Kobistek, Roberts light duty):17,009
>
> 2017 (Weleski light duty): 19,257
>
> 2018 (Shaffer light duty): 20,287

(Def. Answer to Second Interrogatory No. 3, Plt. Ex. 4).

87. "Calls" include walk in complaints, phone call requests, court time, preparing investigative reports, preparing as well as affidavits and warrants, and fingerprinting (Shaffer Declaration ¶1, Plt. Ex. 1).

88. The higher number of RMS calls that the Department receives, the busier the Department is (Shaffer Declaration ¶2, Plt. Ex. 1).

89. In attempting to justify his decisions with respect to Shaffer's light duty assignments, Chief Meyer presented the following hypothetical:

> You know, I have two females that work -- that work for me. Both of them decided to get pregnant at the same time, and I have another office [sic] off on a traffic crash that he was off duty on and he broke his collarbone and now he's asking me for limited duty And then I have another officer at the same time is off with a -- an on duty injury. So now I have four people, and according to Tiffani's accounting I have to give them all 40 hours of work. It just doesn't make sense and it's not fair to the taxpayers of Cranberry Township (Meyer 187:14-188:10)

90. However, at the time Shaffer was pregnant, no other police officers had any work restrictions (Meyer 188:14-19 [Doc. 40-15]).

91. Chief Meyer was able to provide light duty to both Shields and Roberts at the same time, with each being scheduled five days per week, four hours per day, such that they together

covered one eight-hour shift (Shields 9:12-14, 25:3-7, Def. Ex. P [Doc. 40-16]; Shields Timesheets, Def. Ex. S [Doc. 40-19] at 1-4; Roberts Timesheets, Def. Ex. T [Doc. 40-20] at 25-26).

92. Once Roberts' light duty ended, Shields was scheduled on light duty for eight hours each day (Shields 25:9-14, Def. Ex. P [Doc. 40-16], Meyer 39:18-21, Def. Ex. O [Doc. 40-15]; Shields Time Sheets Def. Ex. S [Doc. 40-19] at 4-9).

    Respectfully submitted,

    **ELZER LAW FIRM, LLC**

    /s/ Christine T. Elzer
    Christine T. Elzer
    Pa. I.D. No. 208157

    100 First Avenue, Suite 1010
    Pittsburgh, PA 15222
    (412) 230-8436

    Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of March 2021, I served a copy of the foregoing Plaintiff's Concise Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment upon all counsel of record via CM/ECF.

/s/ Christine T. Elzer
Christine T. Elzer
