**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

TIFFANI M. SHAFFER,                     Civil Action

            Plaintiff,              No.   19-1481

    v.

CRANBERRY TOWNSHIP,                     Judge Wiegand

          Defendant.              JURY TRIAL DEMANDED

**<u>PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

                               Christine T. Elzer
                               Pa. I.D. No. 208157
                               Elzer Law Firm, LLC
                               100 First Avenue
                               Suite 1010
                               Pittsburgh, PA 15222
                               (412) 230-8436

                               Attorney for Tiffani M. Shaffer

## I. Introduction

Defendant, Cranberry Township, provided significantly fewer light duty opportunities to Tiffani Shaffer, a pregnant police officer, than it provided to nonpregnant officers with similar work restrictions. Of the five officers who worked light duty in a five-year period, Shaffer was the only pregnant officer; the only officer to ever be scheduled zero hours, or even less than eight hours, in a light duty week; the only officer not permitted to work at the station unless civilian clerical staff took the day off; and the only officer not to receive a set schedule. While Shaffer was only scheduled an average of 16.7 hours per week, the nonpregnant officers were scheduled an average of between 22 and 43.1 hours per week.

As a result of this less favorable treatment, Shaffer filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Less than two weeks after receiving the EEOC Charge, Chief Kevin Meyer and Human Resources Manager Stacy Goettler met with Shaffer and asked her why she filed the charge. At the same meeting, Chief Meyer removed previously-approved duties from Shaffer, including the ability to take complaints from the public; criminal fingerprinting; and Pennsylvania Instant Checks System ("PICS") cases. This resulted in Shaffer receiving even fewer hours than she received before filing the EEOC charge.

Shaffer alleges that Defendant discriminated against her because of her sex and pregnancy and retaliated against her for filing an EEOC charge, in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act. Defendant has moved for summary judgment, claiming it treated Shaffer the same as all other officers, despite clear record evidence to the contrary.

Tellingly, Defendant fails to cite a single case in which a Court granted a dispositive

motion in an employer's favor in a pregnancy discrimination light duty case.[1] Instead, it asks this Court to deprive Shaffer of the right to a jury trial when courts confronting similar facts have consistently held that material factual issues have precluded judgment in the employers' favor.

As further explained below, a reasonable factfinder could easily find in Shaffer's favor on all of her claims. Therefore, Defendant's Motion for Summary Judgment should be denied.

## II. Argument

### A. Summary Judgment Should Be Denied on Shaffer's Discrimination Claims.

#### 1. Shaffer has pleaded a violation of the Pregnancy Discrimination Act.

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's … sex …" 42 U.S.C. § 2000e-2(a)(1). The statute specifically defines "because of sex" to include "because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work …" 42 U.S.C. § 2000e(k). This amendment to Title VII's definitions section is known as the Pregnancy Discrimination Act ("PDA").

Count I of the Complaint alleges, "Defendant discriminated against Shaffer in the terms, conditions, and privileges of employment because of her sex and pregnancy, in violation of Title

---

[1] None of the cases cited by Defendant resulted in a grant of judgment to the employer. *See Young v. UPS*, 575 U.S. 206 (2015)(vacating grant of summary judgment to employer); *May v. PNC Bank*, 434 F. Supp. 3d 284 (E.D. Pa. 2020)(denying motion for summary judgment); *EEOC v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635 (W.D. Pa. 2017)(granting summary judgment to *plaintiff*); *Durham v. Rural/Metro Corp.*, 955 F.3d 1279 (11th Cir. 2020)(reversing grant of summary judgment); *Maldonado-Torres v. Customized Distribution Servs., Inc.*, 2020 WL 5645686 (E.D. Pa. Sept. 21, 2020)(denying summary judgment); *Legg v. Ulster Cnty.*, 820 F.3d 67, 71 (2d Cir. 2016)(reversing Rule 50 motion in favor of employer and ordering new trial); *Bray v. Town Wake Forest* 2015 WL 1534515, at *13 (E.D.N.C. Apr. 6, 2015)(denying motion to dismiss).

2

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1)" (Complaint ¶22). This allegation, using the phrase "because of her sex and pregnancy," necessarily encompasses the PDA, which defines "because of sex." *See* 42 U.S.C. § 2000e(k).

Moreover, the Complaint unmistakably alleges that Defendant discriminated against Shaffer by providing fewer light duty opportunities than it provided to others. *See* Complaint ¶12 (" all male officers who had previously requested light duty had been given a regular light duty schedule"); ¶19 ("After Officer Shaffer requested light duty, there were only two weeks where Defendant scheduled her 40 hours light duty"); ¶20 ("Defendant has previously accommodated the light duty requests of male officers by scheduling them for 40 hours of light duty per week"). In other words, Shaffer alleges that Defendant treated her less favorably than employees not affected by pregnancy, but "similar in their ability or inability to work." *See* 42 U.S.C. § 2000e(k).

As such, this case falls squarely within the PDA, as interpreted in *Young v. UPS*, 575 U.S. 206, 135 S. Ct. 1338, 1344-45 (2015). There, the Supreme Court held that providing light duty opportunities to nonpregnant employees, while denying those same opportunities to pregnant employees similar in their ability or inability to work, can constitute disparate treatment in violation of the PDA. *See id.* at 1354-55. This is precisely what Shaffer alleges here. Defendant appears to acknowledge as much, having cited *Young* and its progeny several times throughout its Brief. *See, e.g.,* Def. Brief (Doc. 38) at 10 and 13-16.

Nonetheless, Defendant simultaneously claims that the PDA "is not a pled cause of action in the instant case" (Def. Brief at 14). In support, it cites two race discrimination cases: *EEOC v. Catastrophe Mgmt*, 852 F.3d 1018, 1020 (11th Cir. 2016), and *Verrett v. Johnson*, 2015 WL 5125202, at *1 (E.D. La. Sept. 1, 2015). *See id.* The quite obvious fact that the **Pregnancy Discrimination** Act does not apply to **race discrimination** says nothing about whether it applies

here, where an employee explicitly alleges pregnancy discrimination in light duty assignments.

Finally, even assuming that a traditional Title VII *McDonnell Douglas prima facie* case applies here rather than the modified PDA framework set forth in *Young*, Shaffer still survives summary judgment. As Defendant notes, a plaintiff establishes a *prima facie* case if she points to evidence of the following elements: (1) she was pregnant; (2) she was qualified; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably, or there is otherwise a nexus between the pregnancy and the adverse action. *See* Def. Brief at 4; *see also Doe v. C.A.R.S. Protection Plus*, 527 F.3d 358, 366 (3d Cir. 2008). Here, Defendant only challenges the final two elements: whether Shaffer suffered an adverse action, and whether others were treated more favorably. The adverse action element is addressed in Part 2(a) below, and the more favorable treatment element is addressed in Part 2(b) below. Thus, Shaffer establishes a *prima facie* case regardless of whether her case proceeds under the PDA or under a standard Title VII framework.

### 2. Shaffer has established a *prima facie* case.

A plaintiff alleging discrimination in accommodations under the PDA establishes a *prima facie* by showing: (1) she was pregnant; (2) she sought accommodation; (3) the employer did not accommodate her; and (4) the employer did accommodate others "similar in their ability or inability to work."[2] *Young*, 135 S. Ct. at 1354. If a plaintiff establishes a *prima facie* case, "these facts are enough, if left unexplained, for a reasonable jury to conclude that it is more likely than not that that the policy was motivated by a discriminatory intent." *Legg v. Ulster County*, 820 F.3d 67, 74 (2d Cir. 2016).

---

[2] Those "similar in their ability or inability to work" include nonpregnant women. *See E.E.O.C. v. Ackerman, Hood & McQueen, Inc.*, 956 F.2d 944, 948 (10th Cir. 1992); *McCormick v. Allegheny Valley Sch.*, 2008 WL 355617 (E.D. Pa. Feb. 6, 2008).

Here, Defendant does not dispute that Shaffer was pregnant. It also cannot dispute that she sought an accommodation in the form of a regular light duty schedule. However, it appears to dispute the third and fourth prongs: whether it failed to accommodate her, and whether it accommodated others similar in their ability or inability to work. However, a reasonable jury could easily find that Shaffer meets both of these elements.

### a. Defendant failed to accommodate Ms. Shaffer by significantly reducing her hours.

Throughout the 26 weeks of Shaffer's light duty period, Defendant materially reduced her hours, and failed to provide her a set schedule. Prior to working light duty, Shaffer worked 84 hours per pay period, or 42 hours per week (Shaffer 74:19-23, Def. Ex. L). However, during her light duty period, she worked an average of 16.7 hours per week. *See* Shaffer Timesheets, Def. Ex. W (Doc. 40-23). For four of those weeks, she was scheduled for **zero** hours. *See id.* at 13, 20, 25, 28. For another seven of those weeks, she was scheduled for between two and eight hours. *See id.* at 8, 14, 15, 16, 17, 19, 27. As such, for 11 weeks, she worked one full day or less.

Defendant claims that this reduction in hours is not an adverse employment action. At the outset, "adverse employment action" is not part of the *prima facie* case under *Young. See* 135 S. Ct. at 1354. Nonetheless, even assuming that Shaffer must show an adverse employment action, she has done so here. As Defendant concedes, even a *de minimus* reduction in hours can constitute an adverse employment action. *See* Def. Brief at 9. Chief Judge Hornak's opinion in *EEOC v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635 (W.D. Pa. 2017)[3] contains a thorough analysis of what constitutes an adverse action, or "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."

---

[3] Curiously, Defendant refers to this Western District of Pennsylvania decision as a "Third Circuit case." *See* Def. Brief at 9. It also refers to two other (unpublished) district court decisions as Circuit decisions. *See id.* at 15-16.

*See id.* at 658-59 (citing *Storey v. Burns Intern. Security Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). As the Court noted, *any* reduction in compensation constitutes an adverse action. "Facially, a reduction of shifts, and its resulting reduction in compensation, will constitute an adverse employment action." *Bob Evans*, 275 F. Supp. 3d at 662. This is the case even if the change in compensation is not "substantial," "significant," or "considerable." *Id.*

Here, Ms. Shaffer experienced a significant loss in pay. During the pay periods before her light duty assignment, she earned between $2639 and $2797 in a two-week period. *See* Pay Sheets, Def. Ex. D. at 1. After she requested light duty, her pay was reduced drastically. In three separate pay periods, she earned only $265. In an additional eight pay periods, she earned under $1,500. *See id.* at 1-3. She never earned the same amount as she did before she took light duty. *See id.* As such, Ms. Shaffer has "facially" suffered an adverse action. *See Bob Evans*, 275 F. Supp. 3d at 662.

Moreover, the change from being an employee with an "automatically generated schedule to one relegated to doing fill-in work is discrimination in a term, condition or privilege of [] employment." *Id.* at 661. Here, rather than having a set schedule, Ms. Shaffer worked "day to day," and did not know until a day or two beforehand when she would be working (Shaffer 95:14-96:4, Def. Ex. L; *see also* Emails, Def. Ex. H at 14, 34, 40, 57, 58, 64). The only exception was when a member of the clerical staff was scheduled to be off, at which times she was scheduled to work in their place. *See id.* and 65:14-66:7. In other words, Ms. Shaffer was not scheduled "unless she could find an available shift due to a 'hole' in the schedule … or because someone had called-off." *Bob Evans*, 275 F. Supp. 3d at 661. For these reasons, Shaffer has clearly demonstrated an adverse employment action and/or a failure to accommodate.

### b. Defendant accommodated others similar in their ability or inability to work.

As noted above, Shaffer worked zero hours for four weeks, and between two and eight hours for an additional seven weeks. No other officer on light duty was *ever* scheduled for zero hours in any given week, except when on leave or vacation. *See* Def. Ex. S through V (Doc. 40-19 to 22). Moreover, no other officer was ever scheduled for eight or less hours in any week, with the exception of Officer Mark Shields' first week of light duty. *See id.*

Defendant scheduled Shaffer for significantly fewer hours than it scheduled all nonpregnant officers' light duty hours. A comparison of each officer's available light duty hours is set forth below:

| Officer | Average Available Hours per week | Total Hours (Worked plus voluntary time off) | # of weeks | Lowest hours per week (non-vacation/ leave) |
|---------|----------------------------------|---------------------------------------------|------------|---------------------------------------------|
| Shaffer | 16.7 | 436.5 | 26.2 | 0 |
| Evanson | 22 | 976 | 44.2 | 10 |
| Kobistek | 22.9 | 508 | 22.2 | 12 |
| Shields | 35.8 | 300.5 | 8.4 | 8 (first week) / 20 otherwise |
| Roberts | 43.1 | 624.5 | 14.5 | 11.5 (final week) 22 otherwise |

*See* Def. Exhibits S through W.

As is clear from the above, Shaffer was objectively treated worse than every other officer to work light duty in a five-year period.

Moreover, Shaffer was the only light duty officer not to receive a set schedule. Unlike all

other light duty officers, Shaffer only received a set schedule when the office staff was off work and she filled in for them. *See* Shaffer 65:14-66:7, Def. Ex. L.  Neither Shields' nor any other light duty officers' schedules were dependent on the vacations of the office staff (Shields Declaration ¶¶4-5, Plt. Ex. 2). As such, Defendant's decision to only give Shaffer a set schedule when the office staff was off, while regularly giving a set schedule to others, constitutes more favorable treatment toward nonpregnant employees. As explained below, these employees were similar in their ability or inability to work.

"The comparator analysis under the PDA focuses on a single criterion—one's ability to do the job." *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1286 (11th Cir. 2020)(quoting *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1228 n.14 (11th Cir. 2019)). If neither the plaintiff nor a comparator can perform a function of the job, they are similar in their ability or inability to do the job. *See id.; see also Maldonado-Torres v. Customized Distribution Services, Inc*., 2020 WL 5645686, at *8-10 (E.D. Pa. Sept. 21, 2020)(holding a reasonable juror could conclude plaintiff was similarly situated in her ability to perform light duty as her comparators, when they had more severe lifting restrictions, while plaintiff was instructed not to bend her body at work); *Townsend v. Town of Brusly*, 421 F. Supp. 3d 352, 363–64 (M.D. La. 2019)(comparing the plaintiff to officers receiving light duty while recovering from shoulder surgery and from eye surgery).

Here, Shaffer was similar in both her ability and her inability to work as the others who received light duty. For example, Shields was unable to perform arrests, fire a weapon, transport prisoners, pursue fleeing suspects, or lift a certain amount of weight (Shields 7:20-8:23, Def. Ex. P). He was cleared to perform the following duties: (1) handle and document telephone calls on station that would otherwise require a duty officer's response; (2) handle and document walk-in complaints that would otherwise require a duty officer's response; (3) correct and merge addresses

in the RMS; and (4) conduct any relevant or required online training. *See* Email re Mark Shields Dated 8/7/15, App. Ex. 5.

Similarly, Roberts was unable to perform the functions of a patrol officer (Meyer 45:14-17, Def. Ex. O). Instead, he was assigned "answering phones and handling walk-in complaints as well as any other general office duties that can be completed in a sedentary fashion" (Letter to W. Roberts dated August 7, 2015, Plt. Ex. 7).

Kobistek also was "not capable of performing the essential duties and functions of a police officer, even with reasonable accommodations" (Letter to J. Kobistek dated February 5, 2015, Plt. Ex. 8). As such, he was assigned a light duty position "performing administrative duties such as handling and documenting calls on station that would otherwise require a duty officer's response, report filing, data entry, and corrections and merging addresses in the RMS." *Id.* As Chief Meyer indicated in a memorandum, Kobistek was to handle phone calls and walk-in complaints, and merge addresses on the RMS system (Memorandum, Def. Ex. E at 2).

Evanson also was unable to perform the essential functions of a police officer (Meyer 76:22-77:7, Def. Ex. O). While on light duty, Evanson corrected and merged addresses in the RMS system, and handled phone calls, documents, and walk-in complaints. *Id.* at 80:17-81:11; *see also* Memorandum re Evanson, Def. Ex. E at 1.

Like every officer set forth above, Shaffer was unable to perform the physical components of the duties of a patrol officer. *See* Essential Duties List, Def. Ex. B. At the same time, she was permitted to use a computer, exercise independent judgment, communicate effectively, gather information for investigations, and read and comprehend legal and non-legal documents. *See id.* All of the duties assigned to other light duty officers (taking walk-in and phone call complaints; working with the RMS system; general sedentary office duties; attending trainings; and working

on PICS cases) were well within Shaffer's restrictions. Indeed, Chief Meyer even noted fingerprints, PICS cases, covering phones, and trainings as possible things Shaffer could do on light duty. *See* Typed Notes, Def. Ex. R at 1; Meyer 102:4-20, 116:10-120:3, Def. Ex. O.

Defendant cannot point to even *one* duty that another light duty officer could perform, but that Shaffer could not perform. Indeed, Chief Meyer admitted that the assignment of hours to Shaffer versus other employees had nothing to do with Shaffer "being unable to perform something that another officer on light duty could perform" (Meyer 181:182:1, Def. Ex. O). In light of this admission, Defendant's argument that Shaffer was not similar in her ability to work borders on frivolous. Given that Defendant provided these similarly-situated officers significantly better light duty opportunities than it provided Shaffer, she has established a *prima facie* case.

### 3. A reasonable jury could find Defendant's proffered reasons to be pretextual.

Once an employee establishes a *prima facie* case, the burden shifts to the employer to state a legitimate, non-discriminatory reason for its actions. *Young*, 135 S. Ct. at 1354. "[C]onsistent with the Act's basic objective, that reason normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those ('similar in their ability or inability to work') whom the employer accommodates." *Id.* If the employer articulates a legitimate non-discriminatory reason, the burden shifts back to the employee to show that the employer's proffered reason is pretextual. *Id.*

An employee may meet this burden by, among other ways, "showing the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." *Id.* Here, Defendant treated 100% of nonpregnant light duty workers better than it treated Shaffer, the only pregnant employee who requested light duty during

Chief Meyer's tenure. This, alone, raises a genuine issue of material fact sufficient to deny summary judgment. *See id.*

Moreover, "even before *Young,* a plaintiff could establish pretext and intentional discrimination by pointing out significant inconsistencies in the employer's justification." *Legg v. Ulster County*, 820 F.3d 67, 75 (2d Cir. 2016). Specifically, a plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)(emphasis in original). "[T[o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)." *Doe*, 527 F.3d at 370. Importantly, "the *prima facie* case and pretext inquiries often overlap. As [Third Circuit] jurisprudence recognizes, evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Id.*

Here, Defendant claims it provided Shaffer "with all the work th[at] she was qualified to do based on her tenure with the Department, and that fit within her doctor's restrictions, and her own comfort level" (Def. Brief at 14). However, a jury could easily disbelieve this explanation.

First, Defendant's (or more accurately, Defendant's *counsel's*) arguments regarding Shaffer's doctor's restrictions or her own "comfort level" have absolutely no record support. Notably, Defendant points to no record evidence that anything about Shaffer's restrictions (whether doctor-imposed or self-imposed) had anything to do with her light duty schedule. Rather,

as set forth in Part 2(b)(ii) above, Shaffer had the same type of work restrictions as every other officer on light duty; essentially, sedentary work that did not allow in-uniform or on-the-road policework. Every single duty that Shaffer complains of not receiving —e.g., walk-in complaints, phone call complaints, PICS cases, and a set schedule—were well within her doctor's restrictions. *See* Essential Duty List, Def. Ex. B.

Neither Chief Meyer nor anyone else testified that Shaffer's own comfort level affected the duties she was assigned. The only reference to anything resembling Shaffer's "comfort level" in the record relates to when Chief Meyer told Shaffer that he could revisit her duties if she went back to her doctor to *change* some of her work restrictions. Shaffer testified she was concerned that *if* her doctor changed her restrictions, she would be put back in uniform, and she was not comfortable doing so at five and a half months pregnant (Shaffer 85:20-86:6, Def. Ex. L). As such, Defendant twists Shaffer's testimony about *not* asking her doctor to change her restrictions into an assertion that Shaffer was somehow uncomfortable with performing light duty work. This is simply unsupported by the record.

Nor can Defendant point to any evidence that Shaffer's restrictions were a "moving target." *See* Def. Brief at 12. The record reveals only *one* list of duties that Shaffer's doctor believed she could and could not perform, dated June 22, 2018 at the start of her light duty. *See* Def. Ex. B. Defendant's suggestion that Shaffer or her doctor later changed these restrictions is disingenuous at best.

Additionally, a jury could easily find pretext with respect to Defendant's contention that Shaffer was provided all the work she was qualified to do based on her tenure with the Department. Defendant appears to base this argument on its claim that Officer Shields was qualified for work in the detective's office while on light duty, whereas Shaffer was not. *See* Def. Brief at 11-12.

However, Shields denies that he ever worked in the detective's office. Chief Meyer never directed him to do so, nor did he give him any assignments in the Detective's Office (Shields Declaration ¶1, Plt. Ex. 2). Rather than working in the detective's office, he worked in the computer room that patrol officers use, and primarily assisted patrol officers. *Id.* at ¶2. While he made himself available to the detectives if they needed any help, he did not assist them with any regularity, nor was he asked to do so. *Id.* at ¶3. This is a significant factual dispute that could, by itself, cause a jury to seriously question Chief Meyer's credibility.

Additionally, the availability of consistent light duty work for every officer other than Shaffer could easily cause a jury to disbelieve Defendant's claim that such work was simply not available for her. For example, Shields described his light duty work as consisting of exactly what Shaffer wanted to do: listening to the radio and helping officers on the road (Shields 10:20-11:7, Def. Ex. P); making call requests, *id.* at 11:8-12; working on PICS cases, *id.* at 11:13-12:4; assisting walk-ins, *id.* at 12:5-14, pre-populating information on other officers' reports, *id.* at 12:17-13:6, and doing civil fingerprinting, *id.* at 40:7-11. After his light duty stopped overlapping with Roberts' light duty, he was consistently scheduled 40 hours per week (Shields 25:23-25, Def. Ex. P; Shields Timesheets, Def. Ex. S at 5-10). Yet, Shaffer was outright denied the opportunity to do the exact same type of work.

Likewise, Officers Roberts, Kobistek, and Evanson performed similar duties: walk-ins, phone calls, RMS address merging, and general office duties. *See* Letter to W. Roberts dated August 7, 2015, Plt Ex. 7; Letter to J. Kobistek dated February 5, 2015, Plt. Ex.8; Memoranda re Evanson and Kobistek, Def. Ex. E; Meyer 47:17-48:9, 80:17-81:11 Def. Ex. O. As Sergeant Chuck Mascellino testified, the type of light duty provided to most officers was consistent: phone call requests, walk-in complaints, and PICS investigations (Mascellino 11:21-12:6, Def. Ex. M). All

13

these officers worked consistent light duty schedules doing the exact type of work that Shaffer requested to do.

Indeed, Evanson was permitted to do this type of work that Shaffer wanted to do for nearly double the number of weeks as Shaffer required. *See* Evanson Timesheets, Def. Ex. V. Kobistek was able to perform the same type of work four weeks *shorter* than Shaffer, yet received *more* total hours in a shorter period of time. *See* Kobistek Timesheets, Def. Ex. U. Also, as noted above, every single officer worked a greater number of hours per week than Shaffer.

Defendant's ability to schedule each and every light duty officer for the same type of work that it claims was unavailable for Shaffer is particularly suspicious given that the Department was busier when Shaffer requested light duty. Specifically, the Department received over 5,000, 33%, more "calls" in 2018, when only Shaffer needed light duty, versus in 2015, when Kobistek, Roberts, and Shields were all on light duty. *See* Def. Answer to Second Interrogatory No. 3, Plt. Ex. 4. The higher the number of "calls" (walk in complaints, phone call requests, court time, preparing investigative reports, preparing as well as affidavits and warrants, and fingerprinting), the busier the Department is (Shaffer Declaration ¶¶1-2, Plt. Ex. 1). Somehow, Defendant claims that the work was not available for Shaffer, despite being busier than when the same work was available for nonpregnant officers.

Notably, Defendant provided more light duty opportunities when two officers were on light duty at the same time, in contrast to when Shaffer was the only officer on light duty. In attempting to justify his decisions, Chief Meyer presented the following hypothetical:

> You know, I have two females that work -- that work for me. Both of them decided to get pregnant at the same time, and I have another office [sic] off on a traffic crash that he was off duty on and he broke his collarbone and now he's asking me for limited duty And then I have another officer at the same time is off with a -- an on duty injury. So now I have four people, and according to Tiffani's accounting I have

> to give them all 40 hours of work. It just doesn't make sense and it's not fair to the
> taxpayers of Cranberry Township (Meyer 187:14-188:10, Def. Ex. O)

This is not what occurred in reality. No one else "decided to get pregnant," and no one else

sustained an injury. Shaffer was the only one on light duty at the relevant time (Meyer 188:14-19).

In contrast, when both Shields and Roberts were on light duty at the same time, each of them was

scheduled for 20 hours per week, for a total of 40 hours per week (Shields 9:12-14, 25:3-7, Def.

Ex. P; Shields Timesheets, Def. Ex. S at 1-4; Roberts Timesheets, Def. Ex. T at 25-26). Chief

Meyer's treatment of these nonpregnant officers who were on light duty at the same time, versus

his treatment of Shaffer when she was on light duty by herself, is yet another reason why the jury

could disbelieve Defendant's reasons.

For all the foregoing reasons, Defendant's attempted justification for treating Shaffer less

favorably than other officers is full of "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons" that a jury could

find "unworthy of credence." *Fuentes*, 32 F.3d at 765. Therefore, summary judgment should be

denied on Shaffer's discrimination claim.

### B. Summary Judgment Should Be Denied on Shaffer's Retaliation Claims.

On June 22, 2018, Shaffer began light duty. The same day, Chief Meyer assigned her a

total of 22 shifts from July 2 to September 17 when the clerical staff were on vacation (Chief

Meyer Emails, Def. Ex. H at 1; Meyer 159:2-11, Def. Ex. O). During the first several weeks of

light duty, Shaffer worked between 20 and 39.5 hours per week, including work on "prints"

(Shaffer Timesheets, Def. Ex. W at 3-7).

On July 13, 2018, Defendant received notice of Shaffer's charge of discrimination (Def.

Ex. I). Less than two weeks later, on July 26, 2018, Chief Meyer scheduled a meeting with Shaffer

and Human Resources Manager Stacy Goettler (Meyer 136:11-16, Def. Ex. O; Shaffer 93:6-10,

Def. Ex. L). At that meeting, Meyer specifically asked Shaffer about why she filed the EEOC charge and how it could be remedied (Shaffer 93:11-16; Meyer 135:6-24). In response, Shaffer stated that she was looking for a set schedule as others had been given in the past, as well as 40 hours per week (Shaffer 93:21-94:3, 66:22-67:14).

Instead of granting this request, Chief Meyer told Shaffer that he would no longer allow her to do criminal fingerprinting, PICS cases, or even to take walk-in and phone call complaints when the office staff was off (Meyer 148:14-149:2; Shaffer 84:2-11, 109:3-13, 111:13-22). The loss of the fingerprinting opportunity resulted in a loss of four to eight steady hours per week. *See* Meyer 106:18-108:7; Shaffer 63:9-12. The loss of PICS cases, as well as the loss of the ability to take walk-ins and phone calls, resulted in the loss of work doing follow-up investigations and attending court (Shaffer 111:23-112:2; 117:21-24).

### 1.   Shaffer establishes a *prima facie* case of retaliation.

Shaffer establishes a *prima facie* case of retaliation if she points to evidence that (1) she engaged in protected activity; (2) Defendant took an adverse action against her; and (3) a causal connection between the protected activity and adverse action. *See, e.g., Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006). Defendant appears to concede, as it must, that Shaffer engaged in protected activity by filing an EEOC charge. *See* 42 U.S.C. § 2000e-3(a)(prohibiting retaliation because an employee has *"*participated in any manner in an investigation, proceeding, or hearing under" Title VII).

Defendant contends, however, that Shaffer did not suffer an adverse employment action. This argument rests on the flawed premise that Shaffer's hours increased following notice of her EEOC charge. *See* Def. Brief at 38. A review of the timeline shows that this is simply not true. Rather, before the meeting where the parties discussed Shaffer's EEOC charge, she worked an

average of **29.7** hours per week. *See* Shaffer Timesheets, Def. Ex. W at 3-7. After the meeting, she worked an average of **14.9** hours per week for the remainder of her light duty. *See id.* at 8-28. Indeed, the very week after the July 26 meeting, Shaffer only worked seven hours. *See* Ex. W at 8. As such, Shaffer's hours were clearly reduced following the meeting.

Defendant does not appear to contest that Shaffer has raised a genuine issue of material fact with respect to causation. Nor could it. A "plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between [her] protected activity and the adverse action taken against [her]." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2006). "An 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Id.* Shaffer can also rely on "other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole." *Id.*

Here, Chief Meyer met with Shaffer about taking away her duties just thirteen days after Defendant received the EEOC charge. This is sufficient evidence from which a jury could infer a causal connection. Notably, Chief Meyer explicitly referenced the EEOC charge at the same meeting where he told Shaffer she could no longer do fingerprinting, PICS cases, walk-ins, or phone calls. This is further evidence from which a jury, when viewing the record as a whole, could draw a causal link between Shaffer's filing of the EEOC charge and her reduction in hours. As such, Shaffer establishes a *prima facie* case of retaliation.

### 2. A reasonable jury could find Defendant's reasons pretextual.

As with Shaffer's discrimination claim, once she establishes a *prima facie* case of retaliation, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for

its actions. *Marra*, 497 F.3d at 301. Here, Defendant claims it reduced Shaffer's hours because (1) "Ms. Shaffer began to renege on the list of light duty work that she was comfortable performing," and (2) she invoked the two-week notice provision of the Collective Bargaining Agreement (CBA). *See* Def Brief at 18. A jury could easily find both of these explanations to be pretextual.

### a.  A jury could disbelieve Defendant's explanation regarding the removal of duties.

First, there is zero record evidence that Shaffer "began to renege on the list of light duty work she was comfortable performing" (Def. Brief at 18), or even that she expressed any discomfort in performing any light duty work. *See* Shaffer Declaration ¶7, Plt. Ex. 1. Rather, Chief Meyer—not Shaffer—took away her duties.

According to Defendant, "Shaffer was allowed to do fingerprinting until Chief realized there was a likelihood that she would have to take individuals into custody with criminal fingerprinting" (Def. Brief at 18). Defendant provides no explanation—much less a convincing one—of why Chief Meyer would come to this "realization" only *after* Shaffer filed an EEOC charge. Nothing else changed between June 22, when Defendant specifically wrote to Shaffer "you have been cleared to perform fingerprinting detail as it is scheduled" (Def. Ex. C), and when it took this detail away on July 26.

To the extent Defendant blames Shaffer's doctor's restrictions, this is implausible. Shaffer's doctor specifically wrote "ok" next to "process arrested suspects to include taking photographs and obtaining legible fingerprints" (Def. Ex. B at 2). If Chief Meyer believed there was any inconsistency in Shaffer's doctor's restrictions (despite not seeing any such inconsistency for a full month before he discussed Shaffer's EEOC charge with her), he could have contacted Shaffer's doctor for clarification. He failed to do so.

18

Moreover, Defendant misrepresents the record in claiming "there was a likelihood that she would have to take individuals into custody with criminal fingerprinting." Rather, in the 25 years that Chief Meyer has worked for the Department, he is not aware of a single violent incident occurring during fingerprinting (Meyer 153:8-19, Def. Ex. O). This is yet another reason why a jury could call Defendant's explanation regarding fingerprinting into question.

Likewise, Defendant claims "the reason the Chief took PICS away from Ms. Shaffer was because he was uncomfortable with Ms. Shaffer being in court or in the field as she could not effectuate an arrest and was contradictory to her doctor's recommendations" (Def. Brief at 8). Again, a jury could question why Chief Meyer believed it was acceptable for Shaffer to work on PICS cases until she filed her EEOC charge. Moreover, Officer Shields was allowed to work on PICS cases while on light duty (Shields 11:20-12:4, Def. Ex. P). Like Shaffer, his doctor restricted him from effectuating an arrest. *Id.* at 7:20-8:7. As such, this more favorable treatment toward another employee could cause a jury to find pretext. *See Marra*, 497 F.3d at 302.

Defendant fails to even address why it took away Shaffer's ability to take away walk-ins and phone calls while she was already working, resulting in a loss of follow-up work. As set forth in Part A(2)(b) above, every officer on light duty was permitted to take walk-ins and phone calls. This is yet another example of more favorable treatment from which a jury could find pretext.

### b.  A jury could disbelieve Defendant's explanation regarding the CBA.

The CBA between Defendant and the police union provides:

> The Township shall post schedules for six (6) weeks of work at least two (2) weeks prior to the effective date of said schedule. Two weeks' notice shall be provided of any schedule changes, except in the case of an emergency or other circumstances beyond the Township's control. (CBA ¶8.1(a), Plt. Ex. 9).

Though Defendant claims Shaffer "invoked" this provision, it is not optional, and does not require "invocation." *See id.* It is more accurate to state that Defendant violated this provision until

the union spoke to Chief Meyer about it in September 2018. *See* Def. Ex. K. In any event, Shaffer raised the two-week notice provision in the hopes of receiving a set schedule like others on light duty (Shaffer 99:11-21). However, she still did not receive a set schedule thereafter.

Instead, a jury could find that Chief Meyer weaponized the two-week notice provision against Shaffer, using it to deny her work that would otherwise be available. As both Chief Meyer and Sergeant Mascellino admitted, this provision only applies to involuntary schedule changes. It does not preclude voluntarily agreeing to take over shifts when others call off (Meyer 168:11-169:5, Def. Ex. O; Mascellino 44:16-45:5, Def. Ex. M). Nonetheless, Chief Meyer would not allow Shaffer to work when the office staff called off with less than two weeks' notice (Shaffer 146:4-147:8).

Moreover, Shields had a markedly different experience when raising the two-week notice issue. Shields had childcare concerns related to receiving only four days' notice to work Monday through Friday from 8:00 am-4:00 pm, and therefore asked Defendant to honor the two-week notice provision (Shields 27:22-30:22). After raising the two-week notice provision, he continued to receive a schedule of eight hours per day through the remainder of his light duty. *Id.* at 31:23-32:2. Again, this difference in treatment could cause a jury to find pretext. *Marra*, 497 F.3d at 302.

### C. Plaintiff Withdraws the Request for Punitive Damages.

Defendant correctly notes that municipalities are immune from punitive damages. As such, Shaffer will not seek punitive damages at trial. The withdrawal of this item of damages has no effect on the merits of Shaffer's discrimination or retaliation claims.

### III. Conclusion

For all the foregoing reasons, Shaffer has demonstrated genuine issues of material fact with respect to her discrimination and retaliation claims. Therefore, Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,

**ELZER LAW FIRM, LLC**

<u>/s/ Christine T. Elzer</u>
Christine T. Elzer
Pa. I.D. No. 208157

100 First Avenue, Suite 1010
Pittsburgh, PA 15222
(412) 230-8436

Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of March, 2021, I served a copy of the foregoing Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment upon all counsel of record via CM/ECF.

<u>/s/ Christine T. Elzer</u>
Christine T. Elzer