**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TIFFANI M. SHAFFER, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | No: 19-1481 |
| | ) | |
| v. | ) | District Judge Christy Criswell Wiegand |
| | ) | |
| CRANBERRY TOWNSHIP, | ) | **ELECTRONICALLY FILED** |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S CONCISE
STATEMENT OF MATERIAL FACTS IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF 42)**

AND NOW, comes Defendant, CRANBERRY TOWNSHIP, by and through its attorneys,
MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, TERESA O. SIRIANNI,
ESQUIRE and MORGAN M. J. RANDLE, ESQUIRE and files the within Response to Plaintiff's
Concise Statement of Material Facts (ECF 42), as follows:

1.      Tiffani Shaffer graduated from the Indiana University of Pennsylvania Police
Academy in November 2012. She then worked for the Butler County Sheriff's office from
November 2012 to January 2017. While working for the Sheriff's office, she also worked for the
Butler Community College campus police, and then as a patrol officer for Saxonburg Borough
(Shaffer 8:19-10:10) Def. Ex. L [Doc. 40-12]).

**RESPONSE: Undisputed.**

2.      On January 9, 2017, Shaffer began working for Cranberry Township Police Department as a patrol officer (Meyer 17:7-13, Def. Ex. O [Doc. 40-15]; Shaffer 8:19-22; 10:5-7 [Doc. 40-12]).

**RESPONSE: Undisputed.**

3.      On the same day, Cranberry Township Police Department hired its only other current female officer, Robin Mammarelli (Meyer 17:7-13 [Doc. 40-15]).

**RESPONSE: Undisputed but incomplete.  While Ms. Mammarelli is the only other current female officer, the Township has employed other female officers prior to Ms. Mammarelli and Plaintiff.  *See, e.g*., Meyer 23:24-24:5; *See* Chief Meyer Declaration at Def.'s Ex. Y.**

4.      The Township employs 31 police officers, and three civilians that do clerical work in the office (Meyer 13:12-14; 16:3-15 [Doc. 40-15]).

**RESPONSE: Undisputed.   By way of further answer, this is more officers than the Department employed between 2015-2017.  *See* Meyer Declaration, Def.'s Ex. Y.**

5.      Shaffer, like all police personnel, ultimately reported to Chief Kevin Meyer (Meyer 11:12-17, Def. Ex. O [Doc. 40-15]).

**RESPONSE: Undisputed.**

6.      Cranberry Township has no written policy for light duty or modified duty for patrol officers (Meyer 18:8-13 [Doc. 40-15]).

**RESPONSE: Undisputed.**

7.     Police employees who have worked light duty include Officers Mark Shields, Jeffrey Kobistek, William Roberts, Rhonda Evanson, Michael Weleski; Sergeants Irvin and Ahlgren; and Chief Meyer (Meyer 23:13-24:23, Def. Ex. O [Doc. 40-15]; *see also* Def. Ex. S-W [Docs. 40-19 through 23]).

**RESPONSE: Undisputed in part. Plaintiff's footnote to this paragraph provides legal conclusions as to who Ms. Shaffer is identifying as a comparator.  Specifically, Plaintiff notes that she will be using Officers Shields, Kobistek, Roberts and Evanson as her comparators. Defendant, as set forth in its Brief in Support of Summary Judgment, disputes that Officer Shields can serve as Plaintiff's "comparator" given the great differential and distinguishability of their respective caseloads, seniority and experience with the Department.**

8.     In 2015, Officer Mark Shields had a work-related injury that made him unable to perform some of the essential functions of his job as patrolman (Meyer 34:10-16, Def. Ex O [Doc. 40-15]; Shields 7:12-19, 34:2-10, Def. Ex. P [Doc. 40-16]).

**RESPONSE: Undisputed.**

9.     While on light duty, Shields was unable to perform arrests, fire a weapon, transport prisoners, pursue fleeing suspects, or lift a certain amount of weight (Shields 7:20-8:23).

**RESPONSE: Undisputed.**

10. At that time of his light duty, Shields was supervised by Chief Meyer and Sergeant Mascellino (Shields 5:24-6:7).

**RESPONSE: Undisputed, but this citation is incomplete. This citation refers to testimony regarding Shields' current reporting to Corporal William Och, Sergeants Ahlgren and Mascellino, and the Chief. Officer Shields did not testify at this citation whether the same individuals supervised him during his light duty.**

11. Prior to Shields being released to work light duty, Defendant's Human Resources Department described the following light duty activities to his physician's office:

- Handle and document telephone calls on station that would otherwise require a duty officer's response.

- Handle and document walk-in complaints that would otherwise require a duty officer's response. These can be handled through the reception window.

- Correct and merge addresses in the RMS.

- Conduct any relevant or required on-line training.

(Email re Mark Shields Dated 8/7/15, Plt. Ex. 5).

**RESPONSE: Undisputed, though this document is one that speaks for itself and should be read as a whole.**

12.     Shields' light duty work included listening to the radio and helping officers on the road (Shields 10:20-11:7); making call requests, *id*. at 11:8-12; working on PICS cases, *id*. at 11:13-12:4; assisting walk-ins, *id*. at 12:5-14, pre-populating information on other officers' reports, *id*. at 12:17-13:6, and doing civil fingerprinting, *id*. at 40:7-11.

**RESPONSE: Undisputed, and notably, the same type of tasks Plaintiff performed on light duty.**


13.     Shields was permitted to attend court while on light duty (Meyer 37:10-15 [Doc. 40-15]).

**RESPONSE: Disputed. To the contrary, Chief Meyer testified that he thought Shields had a court appearance or two while on light duty.  However, Officer Shields testified that he could not remember whether he went to court while on light duty.  Shields Depo., 21:9-11, Def. Ex. "P."**


14.     Shields was able to keep himself busy while on light duty for 40 hours a week and contributed meaningful police work during that time (Shields 23:25-24:7 [Doc. 40-15].

**RESPONSE: Disputed as stated.  To the contrary, Shields' testimony specifically notes that he did not start at 40 hours a week, though he was eventually able to get to that.  Shields, 24:4-25:14.  Further, when Shields was first placed on light-duty on September 29, 2015, there was no work available for him to complete within his restrictions until October 22, 2015. *See* ¶35 of Defendant's Concise Statement of Material Facts (ECF 39), and Undisputed by Plaintiff in Response at ECF 41.**

15.     Officer Roberts was on light duty for work related injuries in both February 2013 and May 2015 (Meyer 41:11-13, 42:13-23 [Doc. 40-15]; Defendant's Supplemental Answers to Interrogatories No. 5, Plt. Ex. 3).

**RESPONSE: Undisputed.**


16.     On both occasions, Roberts was unable to perform the essential functions of his job as patrolman (Meyer 45:14-17 [Doc. 40-15]).

**RESPONSE: Undisputed.**


17.     Chief Meyer was involved in assigning the duties to Roberts in 2015 (Meyer 43:22-44:2; 47:9-13 [Doc. 40-15]).

**RESPONSE: Undisputed but incomplete. Chief Meyer testified that former Public Safety Director, Jeff Schuller, could have also been involved in assigning duties to Roberts in 2015. Meyer, 43:11-44:22.**

18.     On August 7, 2015, Chief Meyer sent Roberts a letter stating:

>       You will be working 8am-4 pm, M-F in a light duty capacity, consistent
>       with your release to return to work issued by PA [redacted] dated July 23,
>       2015. Your responsibilities will include answering phones and handling
>       walk-in complaints as well as any other general office duties that can be
>       completed in a sedentary fashion.

(Letter to W. Roberts dated August 7, 2015, Plt. Ex. 7).

**RESPONSE: Undisputed but misleading and incomplete.  Plaintiff neglects to include the entirety of this letter, which specifically includes indication that "[a]lthough we expect to have you work in this manner until you are cleared and return to full duty, remember that there is no guarantee of permanent light duty work and the opportunity may cease at any time."  *See*. Plt. Ex. 7.**

19.     During his light duty in 2015, Roberts answered phones, filled in for clerical staff, managed walk-in complaints, and assisted other officers (Meyer 47:17-48:9 [Doc. 40-15]).

**RESPONSE: Undisputed but incomplete.  Chief Meyer also incorporated in Roberts' 2013 light duty work availble creating and attaching documents to the Department's records management system, and assisting the fire company with their record system and alarm billing (Meyer, 45:18-48:3).  In any event, notably, the averments of this paragraph set forth the same tasks Plaintiff was assigned.**

20.     Kobistek was first on light duty January 2015 to May 2015 (Meyer 58:8-12 [Doc. 40-15]; Kobistek Timesheets, Def. Ex. U [Doc. 40-21]).

**RESPONSE: Disputed.  Kobistek was on modified duty between February 8, 2015 and March 24, 2016.  *See* Chief Meyer's Declaration, Def. Ex. Y.**

21.     On February 5, 2015, Defendant's Human Resources department sent Kobistek a letter, stating, inter alia:

> Given the information obtained from your physician, Chief Meyer has identified temporary light duties consistent within [sic] your restrictions. Since you are not capable of performing the essential duties and functions of a police officer, even with reasonable accommodations, this job involves performing administrative duties such as handling and documenting calls on station that would otherwise require a duty officer's response, report filing, data entry, and corrections and merging addresses in the RMS.

(Letter to J. Kobistek dated February 5, 2015, Plt. Ex. 8).

**RESPONSE: Undisputed but incomplete. Plaintiff's Exhibit 8 is a document that speaks for itself and should be read as a whole.**

22.     On February 18, 2015, Chief Meyer distributed a memo stating that Kobistek would work Monday through Friday each week for four-hour shifts; and was permitted to handle phone calls, walk-in complaints, and merge addresses on the RMS computer system (Memorandum re Kobistek, Def. Ex. E [Doc. 40-5 at 2]).

**RESPONSE: Undisputed but incomplete.  Exhibit E also notes that Kobistek would be doing MIST training for 2014 and 2015, and would not be providing fingerprinting services while on light duty.  *See* Def. Ex. "E."**

23.     While on light duty, Kobistek also focused on completing his in-service training (Meyer 67:3-10 [Doc. 40-15]).

**RESPONSE: Undisputed.  As noted in response to Paragraph 22, Kobistek worked to complete his 2014 and 2015 MIST training.  *See* Def. Ex. "E."**

8

24.     Kobistek was on light duty a second time beginning January 2016. *See* Kobistek

Timesheets.

**RESPONSE: Undisputed.**


25.     Officer Rhonda Evanson sustained a work-related injury that made her unable to

perform the full functions of a patrol officer (Meyer 76:22-77:7 [Doc. 40-15]).

**RESPONSE: Undisputed.  Officer Evanson's light duty was June 2013 through November**

**2014, when the Department still employed a Public Safety Officer who oversaw assignments**

**to light duty officers, rather then Chief Meyer overseeing these assignments.**


26.     On February 24, 2014, Chief (then-Lieutenant) Meyer distributed a memo stating

that Evanson would work Monday, Wednesday, and Friday from 8:00 am to 3:00 pm, and was

permitted to handle phone calls, walk-in complaints, and merge addresses on the RMS computer

system (Memorandum re Evanson, Def. Ex. E [Doc. 40-5 at 1]).

**RESPONSE: Undisputed but incomplete. Exhibit E also notes that Officer Evanson is not to**

**provide fingerprinting services while on light duty.  Also, Exhibit "E" is a document that**

**speaks for itself and should be read as a whole.**

27.     While on light duty, Officer Evanson corrected and merged addresses in the RMS system, and handled phone calls, documents, and walk-in complaints (Meyer [Doc. 40-15] 80:17-81:11).

**RESPONSE: Undisputed but *see* Response to number 26 for complete recitation of Officer Evanson's duties.**

28.     On or around April 11, 2018, Shaffer told Stacy Goettler, Human Resources Manager, that she suspected she was pregnant, and inquired about a light duty policy (Shaffer 11:18-12:1, Def. Ex. L [Doc. 40-12]).

**RESPONSE: Undisputed.**

29.     Goettler told Shaffer there was no light duty policy (Shaffer 12:15-18).

**RESPONSE: Undisputed.**

30.     On or around May 14, 2018, Shaffer told Chief Meyer that she was pregnant (Shaffer 12:1-3).

**RESPONSE: Undisputed.**

31.     Meyer said he would base any light duty assignments on what Shaffer's doctor recommended or restricted, when that time arose (Shaffer 15:9-17).

**RESPONSE: Undisputed but incomplete.  The Department handles all light and modified duty requests the same based upon the Chief's discretion and doctor's recommendations. Ex. N, S. Goettler's Deposition, 11:23- 12:20; Ex. L, Ms. Shaffer's Deposition, 12:4-18; 17:17-18; Ex. O, K. Meyer's Deposition, 18:8- 23:7.**

32.     With Shaffer's approval, Goettler faxed Shaffer's doctor a list of essential duties, which was returned with her doctor's notes on it indicating what duties Shaffer could continue performing on light duty (Goettler 19:20-20:20, Def. Ex. N [Doc. 40-14]; Shaffer 25:5-11 [Doc. 40-12]; Essential Duties List, Def. Ex. B [Doc. 40-2]).

**RESPONSE: Undisputed.**

33.     The list of duties Shaffer was permitted to continue performing included: prepare investigative and other reports; interview and obtain statements from witnesses and suspects; attend court proceedings; endure verbal and mental abuse in an antagonistic environment; and process arrested suspects through taking photographs and fingerprints, among other duties. (Doc. 40-2 at 1-2).

**RESPONSE: It is undisputed that the list of duties notes the within as permissible in Ex. B, however, it is disputed that they are consistent with the other tasks noted as impermissible by Ms. Shaffer's medical provider, or are consistent with the way other light duty employees were treated.**

34.     During a phone call with Meyer and Goettler regarding the essential duties list, Meyer told Shaffer he would not permit her to do light duty hours in the office taking phone calls and walk-in complaints (Shaffer 63:22-64:5 [Doc. 40-12]).

**RESPONSE: Disputed.   To the contrary, Ms. Shaffer testified that Chief Meyer said he would not have her sitting in the office _waiting for those types of calls and complaints_ to come in.   Shaffer, 63:22-64:5. Shaffer did perform these tasks, (_Id._ at 65:9-66:16, 73:14-74:4) as did other light duty officers, when they arose in the course of doing other light duty work.**

35.     However, the only times on light duty that Shaffer was permitted to handle phone calls and walk-in complaints was when she was scheduled to fill in for clerical staff while they were on vacation (Shaffer 65:9-66:7 [Doc. 40-12]).

**RESPONSE: Disputed.   Shaffer did perform these tasks outside of when clerical staff were on vacation, when the tasks were available in addition to other light duty work, i.e., where Plaintiff was not just sitting waiting for such tasks.   Shaffer, 65:9-66:16, 73:14-74:4.**

36.     During the same call, Meyer said that Shaffer could do Pennsylvania Instant Check System (PICS) investigation cases, civil and criminal fingerprints, and community policing events (Shaffer 63:1-17).

**RESPONSE: Disputed as to this citation. This citation relates to duties that Plaintiff felt she could perform and the corresponding discussion, not specifically what Plaintiff was assigned. _See_ Shaffer at 62:21-63:17.   However, it is not disputed that Plaintiff did perform these tasks.**

37.     Shaffer was not given a set schedule with her light duty hours. Instead, Meyer often scheduled Shaffer to work with 24-48 hours advance notice (Shaffer 95:21-24; 150:2-11 [Doc. 40-12]). *See* also Emails, Def. Ex. H [Doc. 40-8] at 14, 34, 40, 57, 58, 64.

**RESPONSE: Disputed.  Plaintiff's own testimony establishes that she was in fact given a schedule approximately a week in advance.  Shaffer, 38:24-39:4; 97:18-24; 94:4-7; 96:5-18.**

38.     On July 2, 2018, Shaffer filed a charge of discrimination with the EEOC as a result of the limited working hours she was afforded compared to other officers previously on light duty (Original EEOC Charge and Inquiry, Plt. Ex. 10).

**RESPONSE: Undisputed, though the document speaks for itself and the Township cannot speculate about why Shaffer filed her Charge.  Also, the Township did not receive a copy of Plt.'s Ex. 10 on the same date.**

39.     On July 13, 2018, Defendant received notice of Shaffer's EEOC charge (Def. Ex. I [Doc. 40-9]).

**RESPONSE: Undisputed, however, the Defendant's Notice was much more limited in detail than the Charge filed by Plaintiff, such that Defendant had no specific information about the claim on the July 13, 2018 date. Compare Def. Ex. I which is what the Township received with Plt. Ex. 10.**

40.     On July 26, 2018, less than two weeks after the Township received notice of Ms. Shaffer's EEOC charge, Meyer, Goettler and Shaffer attended a meeting at Chief Meyer's request (Meyer 136:11-16, Def. Ex. O [Doc. 40-15]; Shaffer 93:6-10, Def. Ex. L [Doc. 40-12]).

**RESPONSE: It is not disputed that on July 26, 2018 Plaintiff, Chief Meyer and Stacy Goettler attended a meeting.**

41.     At the meeting, Meyer and Goettler asked Shaffer why she filed the EEOC charge, and what they could do to remedy it (Shaffer 93:11-16; Meyer 135:6-24).

**RESPONSE: The purpose of this meeting was to discuss Plaintiff's schedule and work availability, though as part of the meeting, Meyer and Goettler wanted to remedy Plaintiff's discontent as exhibited by filing the Notice of Charge which contained no detail as to what Plaintiff felt were issues with her employment.  Def. Ex. "I" and "R."**

42.     In response, Shaffer stated that the situation could be remedied if she received a set schedule as others had been given in the past, as well as 40 hours per week (Shaffer 93:21-94:3, 66:22-67:14).

**RESPONSE: Undisputed but incomplete. Plaintiff stated that she filed the Charge because she was given the advice to file it to "protect herself."  Def. Ex. "R."**

43.    At the same meeting, Meyer explained that he would no longer allow Shaffer to do criminal fingerprinting, even though the list of approved essential duties from her doctor permitted fingerprinting (Meyer 148:14-149:2; Essential Duties List, Def. Ex. B [Doc. 40-2]).

**RESPONSE: Disputed.  As part of this meeting, Chief discussed the fingerprint detail and how he was concerned about Plaintiff being in an environment with known criminals where there is a potential for violence and the need to make an arrest.  *See* Def. Ex. "R."  Other officers have expressed similar concerns.  Ex. P, M. Shields' Deposition, 39:20-43:4.  While Plaintiff's doctor had approved her to provide fingerprinting services, the doctor also determined that Plaintiff was not able to make an arrest, such that Chief Meyer determined that Plaintiff would not be able to do criminal fingerprinting.  *See* Def. Ex. "R."  He still allowed Plaintiff to do civil fingerprinting.  *See* Def. Ex. "R."**

44.    Meyer said that criminal fingerprinting was dangerous; however, there has never been a violent incident during fingerprinting that Meyer is aware of (Meyer 153:8-12).

**RESPONSE: Undisputed but irrelevant.  It is common sense that a violent situation could arise when taking a criminal suspect's fingerprints, and simply because Chief Meyer is not aware of an incident where it has happened, does not mean that it would not.  Further, Plaintiff herself admitted that she believed there was a situation during criminal fingerprinting where a criminal suspect ended up having to be subdued.  Shaffer, 87:16-23.  Other officers to which Plaintiff is attempting to compare herself agree that criminal fingerprinting is unwise for light duty people to do. Ex. P, M. Shields' Deposition, 39:20-43:4.**

45.     The June 22 letter approving light duty specifically stated, "you have been cleared to perform fingerprinting detail as it is scheduled" (Def. Ex. C [Doc. 40-3]).

**RESPONSE: Undisputed, but Exhibit C is a document that speaks for itself and should be read as a whole. Additionally, *see* responses to 43-44.**

46.     Meyer told Shaffer that he was previously able to give Shields full time duty because he had enough experience to work in the detective's office (Shaffer 34:12-22).

**RESPONSE: Undisputed but incomplete.  Meyer was clear in his testimony that Shields' work in the detective's office was "an assignment that we would have for somebody that has some time under their belt" and Shields did this because "he was the most senior officer – tenured officer on the force as a patrolman."  (Meyer 143:16-144:13).**

47.     Meyer testified that Shields' work in the detective's office included answering phones and handling walk-in complaints (Meyer 35:14-21).

**RESPONSE: Disputed as stated.  This citation to the record is about answering phones and handling walk-in complaints *outside of* his work with the detective's office, which were "*incidental*" in nature.  (Meyer 35:14-21; 112:1-9).**

48.     However, Shields has sworn that he did not work in the detective's office while on light duty (Shields Declaration ¶¶1-3, Plt. Ex. 2); *see also* Shaffer [Doc. 40-12] 33:19-34:4.

**RESPONSE: Undisputed that this repeats Shields' statement in his Declaration which Plaintiff just produced but disputed as to the truth of the content of the statement. In any event, whether Shields worked in the detective's office is an irrelevant immaterial fact in this case, as set forth in Defendant's Reply to Plaintiff's Brief in Opposition.**

49.     At the meeting, Shaffer asked Meyer if she could work with Corporal Och with burning DVDs per Och's request (Shaffer 76:1-4; Meyer 139:1-11).

**RESPONSE: Undisputed.**

50.     Meyer later talked to Corporal Och, and decided not to allow Shaffer to burn DVDs, claiming she lacked the necessary experience (Meyer 139:12-140:2).

**RESPONSE: Disputed as stated. Chief Meyer determined not to circumvent the security clearance required to burn DVDs based on Plaintiff's minimal tenure with the Department. Patrol officers are not given the task of burning DVDs and rather this is handled by Sergeant Alghren and Corporal Och who have the necessary security clearances to do so. Ex. O, K. Meyer's Deposition, 139:6-141:7; *See* Meyer's Declaration at Def.'s Ex. Y.**

51.     At the meeting, Shaffer asked Meyer if she would work in the detective's office, but he said she did not have five years of necessary experience (Shaffer 78:4-7; Meyer 144:8-15).

**RESPONSE: Undisputed but incomplete.  The Chief spoke with Sergeant Irvin about Ms. Shaffer helping in the Detective's office but Irvin advised that work wasn't available at the time. Ex. O, K. Meyer's Deposition, 145:7-19. The Chief requested that Irvin let him know if any work became available for Ms. Shaffer. Ex. O, K. Meyer's Deposition, 145:7-19, 147:13-148:8.**

52.     Meyer could have made an exception to the general practice that a patrol officer works for five years before being permanently placed in the detective's office (Meyer 144:14-145:8).

**RESPONSE: Undisputed but irrelevant.  Plaintiff's burden in this matter is to establish that she was treated differently than others similar in the ability or inability to work.  Plaintiff has not produced any evidence that other light duty patrol officers without five years experience were given an "exception" to work in the detective's office.**

53.     After the July 26 meeting, Meyer cut previously approved duties from Shaffer's workload, such as phone calls, walk-ins, fraud investigations, identity theft investigations, PICS cases, and criminal fingerprinting (Shaffer 109:6-13; 111:13-19).

**RESPONSE: Disputed.  Plaintiff's testimony is clear that the reason these were limited was because they "include court," which would require the officer to either be in uniform (which Plaintiff was not comfortable with, Shaffer 85:20-86:6) or required that the individual be accompanied with a uniformed police officer which would be double paying for the same duties and a waste of taxpayer funds (Shaffer, 111:13-113:15; Meyer, 118:8-24); *See also*, Shaffer 109:6-13; 111:13-19.**


54.     Chief Meyer removed Shaffer's ability to take walk-in and phone call requests even on the days that she was already working in the receptionist's office. (Shaffer 111:13-112:2, Def. Ex. L [Doc. 40-12]; Shaffer's Answer to Interrogatory No. 4, Def. Ex. F [Doc. 40-6]).

**RESPONSE: Undisputed but incomplete.  Chief Meyer was clear that the reason for this was because he couldn't have "somebody sitting around waiting for walk ins and phone requests to come in, just to sit there. I -- I need to find some meaningful work for her to be - - to be doing."  Meyer, 141:8-23.  He also noted that "there's limited amount of calls that come in, and that's one of the responsibilities of [full duty patrol officers], is to come in and take those calls."  Meyer, 142:3-10.**

55.     Without the ability to take walk-ins, phone calls, fraud investigations, identity theft investigations, and PICS cases, Shaffer was also unable to continue performing other duties such as follow up investigations, and would no longer be permitted to attend court (Shaffer 111:23-112:2; 117:21-24).

**RESPONSE:  Undisputed that Plaintiff made this statement, but the truth of the same is disputed.  In addition, Plaintiff generally did not attend court while on light duty due to the requirement of wearing a uniform or being accompanied by a uniformed officer which would have required double paying out of taxpayer funds.  *See* response to 53.  Plaintiff went to court on two occasions during light duty, one of which was pre-scheduled, and one of which was based on a case that happened prior to her light-duty.  Shaffer, 109:14-110:1.**

56.     Before the July 26 meeting, Shaffer worked an average of 29.7 hours each week for the first 5 weeks she was on light duty. *See* Doc. 40-23 at 3-7.

**RESPONSE: Undisputed to the extent the documents to which Ms. Shaffer refers speak for themselves. Disputed to the extent Ms. Shaffer is alleging that she received less light duty hours than other officers on light duty.  *See* ECF 39 at 70-74.  A summary of the hours Plaintiff actually worked is as follows:**

- **6/10/18-6/23/18: Regular Hours 3+12= 15**

- **6/24/18-7/7/18: Regular Hours: 20+24=44**

- **7/8/18-7/21/18: Regular Hours: 16+4+39.5=59.5**

- **7/22/18-8/4/18: Regular Hours: 33+4+7=44**

- **8/5/18-8/18/18: Regular Hours: 24+40=64**

- **8/19/18-9/1/18: Regular Hours: 14+40=54**

- **9/2/18-9/15/18: Regular Hours: 8=8**

- **9/16/18-9/29/18: Regular Hours: 8+2=10**

- **9/30/18-10/13/18: Regular Hours: 4.5+16=20.5**

- **10/14/18-10/27/18: Regular Hours: 8 =8**

- **10/28/18-11/10/18: Regular Hours: 24+13.5 = 37.5**

- **11/11/18-11/24/18: Regular Hours: 8+16=24**

- **11/25/18-12/8/18: Regular Hours: 24=24**

- **12/9/18-12/15/18 (1 week): Regular Hours: 8=8**

**Defendant does not include holiday, vacation, sick, bereavement or compensatory hours because the same do not reflect *actual hours worked* and should not be included in any comparisons of hours.  These hours reflect hours actually worked by Plaintiff while on light duty.   Plaintiff was paid for additional hours where she used holiday, vacation, sick, bereavement or compensatory time, though those numbers are not reflected in these calculations.**

57.     After the July 26 meeting, Shaffer worked an average of 14.9 hours each week for the remaining 21 weeks of her light duty. *See* Def. Ex. W (Doc. 40-23) at 8-28.

**RESPONSE: Disputed but irrelevant.  *See* response to number 56. Defendant disputes Plaintiff's insinuation that this change was related to Plaintiff's Charge, and rather, again note that in early September 2018 the Township granted a request by Ms. Shaffer to invoke a two week notice for schedule changes as provided by the Department's Collective Bargaining Agreement. *See* Exhibit "K" September 6, 2018 Letter.  Invoking the two week notice period forced the Chief to restrict her duties further than her doctor's recommendations because he could only schedule her for work he was aware of two weeks in advance. Ex. O, K. Meyer's Deposition, 182:12-21.**

**Defendant additionally disputes that these calculations are relevant to the instant inquiry before the Court.  Plaintiff's burden is to prove that she was treated differently than others similarly situated in their ability or inability to work.  Defendant provided Plaintiff with light duty hours as best it could, that fit within Plaintiff's medical restrictions.  Plaintiff has not cited to any body of law that establishes that she is entitled to 40 hours of light duty per week.  The inquiry into the number of hours that Plaintiff got on light duty is dependent on the work available at the time.  *See* ECF 39 at 70-74.**

58.     After deducting the hours that Chief Meyer had already prescheduled for Shaffer before she filed her EEOC charge, Shaffer worked an average of 10.3 hours per week for the remaining 21 weeks of her light duty. Compare *id*. with Chief Meyer Emails, Def. Ex. H at 1.

**RESPONSE: Disputed and immaterial.  *See* Response to 56-57; ECF 39 at 70-74.**

59.     The Collective Bargaining Agreement ("CBA") between the Township and the police union provides:

> The Township shall post schedules for six (6) weeks of work at least two (2) weeks prior to the effective date of said schedule. Two weeks' notice shall be provided of any schedule changes, except in the case of an emergency or other circumstances beyond the Township's control.

> (CBA Excerpt, ¶ 8.1(a), Plt. Ex. 9)

**RESPONSE: Undisputed.  The CBA is a document that speaks for itself and should be read as a whole.**

60.     In early September 2018, Shaffer contacted two people in the union about the two-week provision in the CBA (Shaffer 98:3-12 [Doc. 40-12]).

**RESPONSE: Undisputed that Plaintiff made this statement, but Defendant is without knowledge of the accuracy of the same.  Defendant is not aware of any party disputing that Plaintiff invoked the referenced provision of the CBA.  Regardless, this averment is immaterial and is not dispositive to the issues in the case.**

61.     The union individuals spoke to Chief Meyer, who agreed to follow the CBA by giving Shaffer two weeks' notice of her schedule (Shaffer 99:3-10 [Doc. 40-12]); September 6, 2018 Letter, Def. Ex. K [Doc. 40-11]).

**RESPONSE: Undisputed.**

62.     Shaffer believed that applying this provision would afford her a set schedule in advance (Shaffer 99:14-21).

**RESPONSE: Undisputed that Plaintiff made this statement, but the substantive allegations behind the stament are disputed, and are further, speculative.**

63.     However, after raising the provision, the only days Shaffer was scheduled to work in advance were the days that the office staff were on vacation (Shaffer 99:22-100:4; *see also* Emails, Def. Ex. H [Doc. 40-8] at 1-5).

**RESPONSE: Disputed.  Shaffer's testimony about office staff vacation related to her being scheduled on days in June, not after invoking the two week provision in September.  *See* Shaffer 99:22-100:4.  Additionally, *see* response to 56, wherein Plaintiff did work light duty hours following her invoking the two weeks notice provision.**

64.     Meyer discontinued calling Shaffer to fill in for employees who called off, even though the union sees this as acceptable practice and an exception to the two-week notice rule (Shaffer 146:4-147:8, Def. Ex. L [Doc. 40-12]); (Meyer 168:23-169:5, Def. Ex. O [Doc. 40-15]).

**RESPONSE: Undisputed that Plaintiff made this statement, but disputed as to the accuracy of the same.  This is a self-serving statement by Plaintiff speculating as to how the union would treat a specific instance, without any actual knowledge or proof of the same.**

65.     In fact, adding shifts to Shaffer's schedule with less than two-week's notice is permitted when the change is voluntary (Mascellino 44:16-23, Def. Ex. M [Doc. 40-13]).

**RESPONSE: Undisputed that Mascellino made this statement but disputed as to the accuracy of the same.  Again, this is a speculative statement by someone without actual knowledge or authority on how the union would treat a specific instance.  Moreover, Plaintiff made clear that she had invoked the two week provision under the CBA.**

66.     Officer Mark Shields had a different experience when invoking the two-week notice rule in the CBA. After he did so, he was scheduled 8 hours each day, 5 days each week, for the remainder of his light duty (Shields [Doc. 40-16] 30:14-15; 31:23-32:2; 37:20-24); *see also* Shields' Time Sheets beginning 11/15/2015, Def. Ex. S [Doc. 40-19] at 5-10).

**RESPONSE: Disputed as stated.  The record is clear that Shields was not given light duty work or a schedule when there was no work.  The record is also clear that Shields' light duty assignments became more intensive such that he was able to occupy himself with light-duty tasks for a full work week.  It is disputed that this was because of, or in any way related to, his invocation of the two week provision.**

67.     Shields' schedule was set every two weeks so that he knew in advance when he would be working (Meyer 40:3-11).

**RESPONSE: Disputed as stated.  Chief Meyer's testimony  specifically states that they were continually evaluating what work was available for Shields.  Meyer 40:3-11.**

68.     Officers' time sheets show the hours that they actually worked, as well as hours that they took off due to vacation, sick, and comp time. If an officer takes vacation, sick, and comp hours, those hours were available for the officer to work, but the officer took off by choice (Shaffer Declaration ¶1, Plt. Ex. 1). All "available hours" referenced below reference hours actually worked, plus hours available but not used due to the officers' choice.

**RESPONSE: Disputed.  Plaintiff's Declaration on this issue is a self-serving, speculative statement made in an effort to distort that facts of the case.  An officer's vacation and compensatory time can be taken to augment hours worked at the officer's convenience.  *See* Meyer Declaration, Def.'s Ex. Y.  Moreover, the relevant comparison is the number of light duty hours provided/worked as opposed to comparing more senior officers who had more time banked to use to augment their hours.**

69.     While Shaffer was on light duty, she was not permitted to take sick time for hours she was not scheduled to work. Rather, she could only take sick time if she had to miss a scheduled day of work due to illness (June 22, 2018 Letter, Def. Ex. C [Doc. 40-3]; Goettler 26:13-23, Def. Ex. N [Doc. 40-14]).

**RESPONSE: Undisputed.  This is the exact nature of what sick time is and employees are unable to use sick time when they are not scheduled to work.  Exhibit C clarifies Plaintiff's sick time leave, indicating that she was to only use the time if she was actually sick due to illness.  Ms. Goettler's testimony was that Plaintiff's pregnancy did not qualify as a sickness, such that Plaintiff was unable to use her sick time simply because of her pregnancy.  Rather, Plaintiff could use the sick time if she actually had an illness.  Goettler 26:13-23.**

70.     During Shaffer's 26.2 weeks of light duty, her available hours were an average of 16.7 hours per week per week. *See* Shaffer Time Sheets, Def. Ex. W (Doc. 40-23).

**RESPONSE: Disputed.  *See* Response to 56.  During Plaintiff's 27 weeks of light duty she took 16 hours of sick leave, including 8 hours during the pay periods of each 8/19/18-9/1/18 and 11/11/18-11/24/18.**

71.     During Shaffer's light duty period, there were four weeks where she was scheduled zero hours. *See* Doc. 40-23 at 13, 20, 25, 28.

**RESPONSE: Undisputed, generally.  It is disputed that p. 28 of ECF 40-23 constituted a light duty period for Plaintiff.  By way of further response, Plaintiff was assigned work as it was available within her restrictions.**

27

72.     During Shaffer's light duty period, there were seven weeks where she was scheduled between two and eight hours. *See* Doc. 40-23 at 8, 14, 15, 16, 17, 19, 27.

**RESPONSE: Undisputed,** *see* **answer to 56.**

73.     No other officer on light duty was scheduled for zero hours in any week, other than while on leave or vacation. *See* Def. Ex. S through V (Doc. 40-19 to 22).

**RESPONSE: Disputed and false.  In response to Defendant's statement that "[w]hen Officer Shields was first placed on light-duty on September 29, 2015, there was no work available for him to complete within his restrictions until October 22, 2015. Ex. X, Defendant's Answers to First Set of Interrogatories, p. 3[,]" Plaintiff responded "[u]ndisputed."** *See* **ECF 41 at 35.  Additionally, Kobistek did not work any light duty hours between 2/8/15 and 2/14/15 (Ex. U at pp. 1-2).**

74.     With the exception of Shields' first week of light duty, no other officer on light duty was scheduled for eight hours or less in any week. *See* Def. Ex. S through V (Doc. 40-19 to 40-22).

**RESPONSE: Disputed,** *see* **response to 73.  Plaintiff was assigned work as it was available within her restrictions.**

75.     Shields was on light duty for nine weeks and had an available hours average of 35.8 hours per week. *See* Def. Ex. S (Doc. 40-19).

**RESPONSE: Disputed.  As an initial matter, this "fact" is immaterial because each light duty officer was provided light duty work as it was available and within their restrictions at that specific time.  In any event, Shields was on light duty between September 29, 2015 and December 18, 2015, or 11.5 weeks total.  Shields did not work any light duty, due to the lack of availability, between September 29, 2015 and October 21, 2015.  *See* ECF 41 at 35.  During his light duty, Shields actually worked 216.5 hours, or an average of 18.8 hours per week. *See* ECF 40-19.**

76.     The beginning of Shields' light duty period overlapped with Officer Roberts' light duty period, during which he and Roberts each worked four-hour shifts five days per week (Shields 24:10-25:5, Def. Ex. P [Doc. 40-16]).

**RESPONSE: Generally, undisputed, however, *see* Ex. S and T for a more accurate depiction of the hours worked by Shields and Roberts.**

77.     Once Shields' light duty stopped overlapping with Roberts' light duty, he was scheduled an average of 42.9 hours per week. *See* Shields Timesheets, Def. Ex. S (Doc. 40-19) at 4-10; *see also* Roberts Timesheets, Def. Ex. T, Doc. 40-20 (showing no hours as of November 8, 2015).

**RESPONSE: Disputed.  As an initial matter, this "fact" is immaterial because each light duty officer was provided light duty work as it was available and within their restrictions at that specific time.  In any event, Ex. S is a document that speaks for itself and should be read as a whole.  Between 11/8/15 and December 18, 2015, or 7 weeks total, Shields actually worked 176.5 hours, or an average of 25.2 hours per week.   This does not include Shields' first several weeks on light duty in which he worked zero hours due to no light duty work being available. *See* 75 above.**

78.     During Roberts' light duty period, his available hours were an average of 43.1 hours per week (Meyer 51:18-22 [Doc. 40-15]; Def. Ex. T [Doc. 40-20]).

**RESPONSE: Disputed. As an initial matter, this "fact" is immaterial because each light duty officer was provided light duty work as it was available and within their restrictions at that specific time.  In any event, Exhibit T is a document that speaks for itself and should be read as a whole.  Roberts actually worked 529.5 hours over 14.5 weeks, averaging 36.5 hours per week.**

79.     During Kobistek's light duty period, his available hours were an average of 22.9 hours each week. *See* Def. Ex. U (Doc. 40-21).

**RESPONSE: Disputed.  As an initial matter, this "fact" is immaterial because each light duty officer was provided light duty work as it was available and within their restrictions at that specific time.  In any event, Ex. U is a document that speaks for itself and should be read as a whole.  Between February 2015 and March 2016, Kobistek actually worked approximately 382.5 hours over 22 weeks, averaging 17.4 hours per week.**

80.     Evanson was on light duty for 44.2 weeks and worked an average of 22 hours per week. *See* Def. Ex. V.

**RESPONSE: Disputed.  As an initial matter, this "fact" is immaterial because each light duty officer was provided light duty work as it was available and within their restrictions at that specific time.  In any event, Ex. V is a document that speaks for itself and should be read as a whole.  Between June 2013 and November 2014, or 44 weeks total, Evanson actually worked 709 hours, or an average of 16.1 hours per week.**

81.    For the last 40 weeks of her light duty period, Evanson worked a set schedule of three seven-hour days. *See* Def. Ex. V (Doc. 40-22) at 9-48.

**RESPONSE: Disputed.  As an initial matter, this "fact" is immaterial because each light duty officer was provided light duty work as it was available and within their restrictions at that specific time.  In any event, Ex. V is a document that speaks for itself and should be read as a whole.  To the contrary, while Ms. Evanson often worked three seven-hour shifts, this was not always the case. *See* Ex. V at pp. 9-14, 30, 34, 39.**

82.    The light duty treatment of the various officers can be summarized as follows:

| Officer | Average Available Hours per week | Total Hours | # of weeks | Lowest hours per week (non-vacation/ leave) | Set schedule? |
|---|---|---|---|---|---|
| Shaffer | 16.7 | Worked: 420.5 Time Used 16 436.5 Total | 26.2 | 0 | No |
| Evanson | 22 | Worked: 709 Time Used: 267= 976 Total | 44.2 | 10 | Yes |
| Kobistek | 22.9 | Worked: 382.5 Time Used: 125.5= 508 | 22.2 | 12 | Yes |
| Shields | 35.8 | Worked: 225.5 Time Used: 75= 300.5 Total | 8.4 | 8 (first week) / 20 otherwise | Yes |
| Roberts | 43.1 | Worked: 529.5 Time Used: 95= 624.5 Total | 14.5 | 11.5 (final week) 22 otherwise | Yes |

*See* Def. Ex. S-W (Doc. 40-19 to 23).

**RESPONSE: Disputed and immaterial.  Disputed because it is not an accurate comparison to review alleged "available" hours, and instead, the accurate method of comparison is actual hours worked.  *See* Response to ¶¶56-57 above.  Immaterial because light duty is assigned on a case-by-case basis depending on the work available at the time.  Plaintiff was provided with light duty work that fit her restrictions and was available at the time.**

**Although Plaintiff's recitation of "worked" hours and number of weeks are disputed, even taking them as true, these average to the following:**

- **Shaffer: 420.5/26.2 = 16.05**

- **Evanson: 709/44.2 = 16.04**

- **Kobistek: 382.5/22.2 = 17.23**

- **Shields: 225.5/8.4= 26.85**

- **Roberts: 529.5/14.5= 36.52**

*See* **Def. Ex. S-W (Doc. 40-19 to 23).**

83.     During the time that Shaffer was on light duty, there were 4 PICS cases available. (Def. Answer to Second Interrogatory No. 1, Plt. Ex. 4).

**RESPONSE: Undisputed.**

84.     However, Shaffer was not permitted to work on PICS cases after the July 26 meeting (Shaffer 109:3-13, 117:14-24, Def. Ex. L [Doc. 40-12]).

**RESPONSE: Undisputed.**

85.     During the time that Shields was on light duty, he was assigned 4 PICS cases (Def. Answer to Second Interrogatory No. 2, Plt. Ex. 4).

**RESPONSE: Undisputed.**

86.     Defendant has received more "calls" in its RMS system each year since 2015, as follows:

        2015 (Shields, Roberts, Kobistek light duty): 15,204

        2016 (Kobistek, Roberts light duty):17,009

        2017 (Weleski light duty): 19,257

        2018 (Shaffer light duty): 20,287

(Def. Answer to Second Interrogatory No. 3, Plt. Ex. 4).

**RESPONSE: Undisputed but incomplete.   The within citation solely provides the corresponding calls with each year, and does not otherwise identify the individuals Plaintiff has put in parenthesis which was not part of the original citation.**

87.     "Calls" include walk in complaints, phone call requests, court time, preparing investigative reports, preparing as well as affidavits and warrants, and fingerprinting (Shaffer Declaration ¶1, Plt. Ex. 1).

**RESPONSE: It is not disputed that the listed items would constitute calls.  However, this is certainly not an exhaustive list and there are additional items that may constitute "calls."**

88.     The higher number of RMS calls that the Department receives, the busier the Department is (Shaffer Declaration ¶2, Plt. Ex. 1).

**RESPONSE: Disputed.  While this statement by Plaintiff may appear to have facial merit, it completely ignores the intricacy and complexity of calls that the Department receives.**

89.     In attempting to justify his decisions with respect to Shaffer's light duty assignments, Chief Meyer presented the following hypothetical:

> You know, I have two females that work -- that work for me. Both of them decided to get pregnant at the same time, and I have another office [sic] off on a traffic crash that he was off duty on and he broke his collarbone and now he's asking me for limited duty And then I have another officer at the same time is off with a -- an on duty injury. So now I have four people, and according to Tiffani's accounting I have to give them all 40 hours of work. It just doesn't make sense and it's not fair to the taxpayers of Cranberry Township (Meyer 187:14-188:10)

**RESPONSE: Undisputed that this was a hypothetical stated by Chief Meyer.  Defendant specifically agrees with Chief Meyer, in that Plaintiff has not given any proof within the law that would require her to get 40 hours a week of light duty.  To the contrary, Chief Meyer's hypothetical specifically supports Defendant's defense that light duty assignments are on a case-by-case basis and specifically depend on the work available on any given day in a police department.  Chief Meyer accurately sets forth Plaintiff's unreasonable position in this case, and explains one reason why Ms. Shaffer's position is without merit and impossible to justify.**

90.     However, at the time Shaffer was pregnant, no other police officers had any work restrictions (Meyer 188:14-19 [Doc. 40-15]).

**RESPONSE: Undisputed that no other officers had work restrictions during the same period that Plaintiff did. However, it is disputed that the fact that no other individuals were also on light duty has any bearing on the work available or which was provided to Plaintiff. Plaintiff's stance would require Chief Meyer to allow Plaintiff to work even when there was no light duty work available, and thus waste taxpayer funds.**

91.     Chief Meyer was able to provide light duty to both Shields and Roberts at the same time, with each being scheduled five days per week, four hours per day, such that they together covered one eight-hour shift (Shields 9:12-14, 25:3-7, Def. Ex. P [Doc. 40-16]; Shields Timesheets, Def. Ex. S [Doc. 40-19] at 1-4; Roberts Timesheets, Def. Ex. T [Doc. 40-20] at 25-26).

**RESPONSE: Undisputed but incomplete and irrelevant.  This paragraph, while true, ignores the fact that the work that came into the station that could be handled by a light duty officer was higher than when Plaintiff was on light duty.  Light duty assignments are provided on a case-by-case basis, taking into account the workload available as well as the specific officer's restrictions and in part, preferences.**

92.   Once Roberts' light duty ended, Shields was scheduled on light duty for eight hours each day (Shields 25:9-14, Def. Ex. P [Doc. 40-16], Meyer 39:18-21, Def. Ex. O [Doc. 40-15]; Shields Time Sheets Def. Ex. S [Doc. 40-19] at 4-9).

**RESPONSE: Generally, undisputed.  However, Plaintiff ignores the fact that the work that came into the station that could be handled by a light duty officer was higher than when Plaintiff was on light duty.  Light duty assignments are provided on a case-by-case basis, taking into account the workload available as well as the specific officer's restrictions and in part, preferences.**

Respectfully submitted,

**MARSHALL DENNEHEY**
**WARNER COLEMAN & GOGGIN**

BY:   *s/ Teresa O. Sirianni*
TERESA O. SIRIANNI, ESQUIRE
PA ID # 90472
MORGAN M. J. RANDLE, ESQUIRE
PA ID #324470
**Counsel for Defendant, Cranberry Township**
Union Trust Building, Suite 700
501 Grant Street
Pittsburgh, PA  15219
(412) 803-1174
(412) 803-1188/fax
tosirianni@mdwcg.com
mmrandle@mdwcg.com

LEGAL/135415648.v1

37