IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIFFANI M. SHAFFER, | ) | |
| | ) | |
| | ) | 2:19-CV-01481-CCW |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CRANBERRY TOWNSHIP, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court is Defendant Cranberry Township's Motion for Summary Judgment.  *See* ECF No. 37.  Because the Court concludes that there are genuine disputes of material fact with respect to all of Plaintiff Tiffani Shaffer's claims, Cranberry's Motion will be DENIED, except with respect to Ms. Shaffer's request for punitive damages, regarding which Cranberry's Motion will be GRANTED.

## I.    Background

### A.    Procedural History

Ms. Shaffer filed her four-count complaint on November 14, 2019.  *See* ECF No. 1.  Ms. Shaffer alleges that, in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) and § 2000e(k) (the Pregnancy Discrimination Act or "PDA"), and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 955, Cranberry (1) discriminated against her on the basis of her pregnancy (Count I – Title VII;  Count II – PHRA) and (2) retaliated against her when she complained about being subjected to allegedly discriminatory treatment (Count III – Title VII;  Count IV – PHRA).  After the close of discovery, Cranberry moved for summary judgment on all of Ms. Shaffer's claims.  Cranberry's Motion is fully briefed and ripe for disposition.

### B.    Relevant Material Facts

The following relevant, material facts, drawn from the parties' competing concise statements of material fact and responses thereto, are undisputed unless noted otherwise.  *See* ECF No. 41 (Plaintiff's Response to Defendant's Concise Statement of Material Facts) and ECF No, 49 (Defendant's Response to Plaintiff's Concise Statement of Material Facts).

### 1.    Timeline of Events

Ms. Shaffer began working as a patrol officer for Cranberry's police department on January 9, 2017.  *See* ECF No. 41. at ¶ 1.  Before working for Cranberry, Ms. Shaffer worked as a law enforcement officer for the Butler County Sherriff's Office from 2012–2017, during which time she also worked as an officer for Butler County Community College campus police and as a patrol officer for Saxonburg Borough.  *See* ECF No. 49 at ¶ 1.  On April 11, 2018, Ms. Shaffer notified Cranberry's Human Resources Manager, Stacy Goettler, that she might be pregnant.  *See* ECF No. 41 at ¶ 2.  She then informed Chief of Police Kevin Meyer that she was pregnant on May 14, 2018.  *See id.*

Cranberry does not maintain a written light or modified duty policy.  *See* ECF No. 41. at ¶ 4.  Instead, Cranberry "handles all light and modified duty requests the same based upon the Chief's discretion and doctor's recommendations."  *Id.* at ¶ 5.  When an employee requests light duty, the employee works with Human Resources and his or her medical provider to identify job restrictions.  For police department employees, Chief Meyer then determines what work is available based on those restrictions.  *Id.* at ¶¶ 6-7.  As such, Chief Meyer told Ms. Shaffer "they would 'keep a line of communication open'" and that he would base her light duty assignments on "her doctor's recommendations and/or restrictions."  *Id.* at ¶ 9.

On June 11, 2018, Ms. Shaffer submitted a note from her doctor to Ms. Goettler recommending that Ms. Shaffer begin light duty that day.  *Id.* at ¶ 12.  After Ms. Goettler requested

clarification as to Ms. Shaffer's restrictions, Ms. Shaffer's doctor "faxed [Cranberry] an essential job duty form with approved job duties for Ms. Shaffer." *Id.* at ¶¶ 12-13.  In general, Ms. Shaffer's doctor indicated that she would not be able to perform high-stress or physically dangerous duties, such as pursuing fleeing suspects, making arrests, or firing weapons, but that she could continue to perform other duties, such as preparing reports, taking fingerprints, monitoring and communicating over radios, and other clerical and administrative functions.  *See* ECF No. 40-2 (document titled "Essential Duties of a Police Officer" with "ok" and "no" markings made by Ms. Shaffer's doctor as relevant).  Ms. Shaffer further informed Cranberry that she was not "sick" and that she and her doctor were primarily concerned with "the high-risk situations [to which] a patrol officer is sometimes subjected."  Ms. Shaffer further expressed concern about the limited amount of vacation and personal compensation time available to her.  ECF No. 41 at ¶ 15.

Chief Meyer, after reviewing the list of restrictions provided by Ms. Shaffer's doctor, determined the available work that fit within Ms. Shaffer's limitations, and assigned her to those duties.  *See id.* at ¶¶ 14, 18.  The parties agree that the duties available at the time Ms. Shaffer went on light duty included "phone call requests, walk-in complaints, fingerprints, follow-ups via phone call, warrants, affidavits, Pennsylvania Instant Check System ('PICS') firearm violations, fingerprints and community policing events." *Id.* at ¶ 17.  The parties dispute, however, whether Ms. Shaffer was, in fact, assigned to those duties.  *See id.* at ¶ 18 (Ms. Shaffer's Response).

On July 2, 2018, Ms. Shaffer filed a charge of discrimination with the EEOC.  *See* ECF No. 49 at ¶ 38  In her charge, Ms. Shaffer alleges that "[m]y hours have been severely reduced," that "full time hours have been provided for both on and off duty injuries in the past," and that "I was told I am not guaranteed hour[s] and have been on a week by week scheduling."  ECF No. 44-

10.  Cranberry received notice of Ms. Shaffer's charge about two weeks later, on July 13, 2018. *See* ECF No. 49 at ¶ 39.

On July 26, 2018, Ms. Shaffer attended a meeting with Chief Meyer and Ms. Goettler to discuss Ms. Shaffer's schedule and work availability. *See* ECF No. 41 at ¶ 78; ECF No. 49 at ¶¶ 40-41. At the meeting, Chief Meyer and Ms. Goettler questioned Ms. Shaffer about "why she filed the EEOC charge and what they could do to remedy it." ECF No. 49 at ¶ 41; *see also* ECF No. 41 at ¶¶ 85–86.

The Collective Bargaining Agreement ("CBA") between Cranberry and the police union provides that "[t]wo weeks' notice shall be provided of any schedule changes, except in the case of an emergency or other circumstances beyond the Township's control." ECF No. 49 at ¶ 59. In early September 2018, Chief Meyer agreed to Ms. Shaffer's request that Cranberry abide by this provision. *See* ECF No. 41 at ¶ 92; ECF No. 49 at ¶¶ 60–61. In making the request, Ms. Shaffer believed that invoking this provision would afford her a set schedule. *See* ECF No. 49 at ¶ 62. Afterwards, the hours that Ms. Shaffer worked each week fell significantly. *Compare* ECF No. 40-23 at 1–12 *with id.* at 13–28.

## 2.   Work Assignments and Comparators

The parties appear to agree that Ms. Shaffer's restrictions, and, consequently, the work she was able to perform, were similar to those of other officers who had been placed on light duty. For example, like Ms. Shaffer, while on light duty Officer Mark Shields "was not able to perform arrests, pursue fleeing suspects, transport prisoners or fire weapons." ECF No. 41 at ¶ 39. And, also like Ms. Shaffer, "he was able to…monitor the radio, take phone call requests, PICS investigations, handle walk-ins, and help other officers on reports." *Id*. Officers William Roberts, Jeffrey Kobistek and Rhonda Evanson all took on similar assignments during the time they each

spent on light duty as a result of being subject to similar physical restrictions.  *See id.* at ¶¶ 47-48 (Roberts);  56 (Evanson);  59 (Kobisteck);  *see also* ECF No. 49 at ¶¶ 8–12 (Shields);  15–19 (Roberts);  21–24 (Kobisteck);  and 25–27 (Evanson).

The parties strenuously dispute how evidence of the other officers' work schedules and hours should be interpreted.  *See, e.g.,* ECF No. 49 at ¶ 82 (including Cranberry's Response).  First, the Court notes that each of these other officers received (or, in Officer Evanson's case, was the subject of) a return to work notice or department memo outlining their duties while under medical restriction and setting forth their schedules.  *See* ECF Nos. 44-6 (Shields), 44-7 (Roberts), 44-8 (Kobisteck), 40-5 (Evanson).  Typical of these letters, Officer Shields' informs him that he "will be scheduled to work a 5 day schedule from 12:00 pm to 4:00 pm, Monday through Friday, until further notice.  Your assignments will be reevaluated in 6 weeks, if you are not released to full duty prior to that time."  ECF No. 44-6.  Likewise, the letters for Officers Roberts, Kobisteck, and Evanson indicate that they will be scheduled for 40, 20, and 21 hours each week, respectively.  *See* ECF Nos. 44-7, 44-8, 40-5.  In contrast, Ms. Shaffer received a letter which informed her that "[y]ou will be assigned to work that is or becomes available that fits within your restrictions as indicated by your physician upon review of your essential functions as a Police Officer."  ECF No. 40-3.

Next, Cranberry contends that the only relevant data point is the actual number of hours worked by each officer.  *See* ECF No. 47 at 3 ("The relevant and more appropriate comparison in this case is to compare the actual number of light duty hours worked.").  Interpreted this way, Cranberry claims, Ms. Shaffer's experience on light duty is not outside the norm.  *See id.* (concluding that Ms. Shaffer worked an average of 16.05 hours/week, as compared with 16.04 for Evanson and 17.23 for Kobisteck).  To the extent Roberts and Shields worked more hours, on

average, Cranberry attributes this fact to seniority alone.  *See id.*  That said, Officers Shields and

Roberts were both, like Ms. Shaffer, patrol officers when they were on light duty.  *See* ECF No.

49 at ¶ 8 (Shields) and ¶ 16 (Roberts).

Ms. Shaffer, on the other hand, contends that the relevant consideration is the number of

light duty hours *available* to each officer.  *See* ECF no. 43 at 7.  Cranberry allows officers to "call

off" from scheduled shifts, either by using accumulated "comp time" (each officer is given 36

hours of comp time each year, and may take certain overtime compensation in the form of

additional comp time) or vacation time.  *See* ECF No. 47 at 2 n.2 (discussing Cranberry's policy

with regard to personal time off) (citing ECF No. 48-1 at ¶¶ 10-11).  Ms. Shaffer's position is that

only looking at hours actually worked drastically undercounts the true number of hours made

*available* to each officer on light duty, whether or not that officer chose to take them.  *See* ECF

No. 49 at ¶ 68;  *see also* ECF No. 41 at ¶¶ 69–74 (including Ms. Shaffer's Responses).  In other

words, Ms. Shaffer maintains that the crux of her claim is that she was denied the *opportunity* to

work that was provided to other, non-pregnant officers on light duty;  thus, the relevant

consideration is not strictly confined to the actual hours worked, but should include hours for which

the other officers could have worked but did not.  *See* ECF No. 43 at 1 ("Defendant, Cranberry

Township, provided significantly fewer light duty opportunities to Tiffani Shaffer, a pregnant

police officer, than it provided to nonpregnant officers with similar work restrictions.").

The Court need not wade too deeply into this debate at this point because, at summary

judgment, the Court must "view the facts in the light most favorable to the non-moving party and

draw all reasonable inferences in that party's favor."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425

(3d Cir. 2013).  Thus, because Ms. Shaffer's interpretation is based on reasonable inferences from

the underlying evidence, the Court will accept it, but only for the limited purpose of resolving the instant Motion.

Next, with respect to Ms. Shaffer's work schedule while on light duty, Cranberry suggests that Ms. Shaffer was, at least initially, "placed on a steady eight hours per day, Monday through Friday schedule" beginning in June 2018.  ECF No. 41 at ¶ 19.  According to Ms. Shaffer, however, Chief Meyer stated that the schedule showing her working a regular eight-hour shift was actually just a "placeholder."  *Id.* (Ms. Shaffer's Response).  Indeed, Ms. Shaffer's actual time sheets, *see* ECF No. 40-23, show that Ms. Shaffer only worked 40 hours (i.e., five, eight-hour shifts) twice while on light duty and 39.5 hours on one other occasion.  *See* ECF No. 41 at ¶ 22 (Ms. Shaffer's Response).  Furthermore, Cranberry implicitly concedes that Ms. Shaffer did not have a regular schedule, given that it (1) notes Ms. Shaffer only had a "set schedule when reception staff was off between June and September [2018];" (2) contends (although Ms. Shaffer disputes the point) that it did not have 40 hours' worth of light duty work within Ms. Shaffer's medical restrictions; and (3) alleges that Chief Meyer "would give [Ms. Shaffer] her schedule a week in advance with varied hours."  *See id.* at ¶¶ 20, 23-25, 54.[1]

While the parties dispute the reasons for what happened after the July 26, 2018, meeting between Ms. Shaffer, Ms. Goettler, and Chief Meyer regarding Ms. Shaffer's light duty work assignments and EEOC complaint, it is not disputed that following the meeting Ms. Shaffer was no longer permitted to do criminal fingerprinting or conduct PICS investigations.  *See* ECF No. 41 at ¶¶ 88–90.  Cranberry contends that Chief Meyer elected to restrict the types of assignments Ms. Shaffer would be given (e.g. she was no longer permitted to do the criminal fingerprint detail) based on the possibility that such duties could involve the need to conduct an arrest, and that Chief

---

[1] Ms. Shaffer disputes whether Chief Meyer scheduled her for shifts a week in advance, pointing to evidence that she was scheduled for shifts with 24-48 hours notice from time to time.  *See* ECF No. 49 at ¶ 37.

Meyer was forced to further curtail Ms. Shaffer's shift assignments when she invoked the CBA two-week clause. *See* ECF No. 41 at ¶¶ 88–90, 93.

Similarly, the parties dispute the reasons why Ms. Shaffer was not permitted to undertake other light duty assignments like assisting in the detective's office or assisting with "burning DVDs for DUI cases" (Cranberry maintains Ms. Shaffer lacked the requisite tenure and clearances to perform these duties) and whether other light duty officers were afforded such opportunities (e.g. whether and why Officer Shields worked in/with the detective's office). *See* ECF No. 41 at 36–37, 44–45, and 80–81; ECF No. 49 at ¶¶ 46–52. However, the parties do not dispute that Ms. Shaffer was not allowed to undertake these duties.

## II.   Standard of Review

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The burden to establish that there is no genuine dispute as to any material fact "remains with 'the moving party regardless of which party would have the burden of persuasion at trial.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (quoting *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987)). Furthermore, "[i]f the non-moving party

bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'" *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87. Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted). But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor . . . to prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations omitted).

## III.  Discussion

In its Motion, Cranberry contends that Ms. Shaffer cannot come forward with evidence sufficient to establish a prima facie claim of pregnancy discrimination under Title VII and the PHRA (Counts I and II).[2]  Specifically, Cranberry targets the third and fourth elements of Ms.

---

[2] Because the Third Circuit has found that "[c]laims under the PHRA are interpreted coextensively with Title VII claims," we will address Ms. Shaffer's parallel federal and state law claims in tandem. *Atkins v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

Shaffer's prima facie case, arguing (1) that Ms. Shaffer cannot point to evidence that she suffered an adverse employment action and (2) even if she did, she cannot point to evidence that Cranberry treated other, non-pregnant officers who were placed on light duty more favorably than Ms. Shaffer.  In the alternative, according to Cranberry, even if Ms. Shaffer can make out a prima facie case of pregnancy discrimination, she cannot carry her burden to show that Cranberry's proffered legitimate, non-discriminatory reasons for its actions are pretextual.  Cranberry advances similar arguments against Ms. Shaffer's retaliation claims (Counts III and IV).  Finally, Cranberry argues that Ms. Shaffer's claim for punitive damages must be dismissed because, as a municipality, it is immune to such claims.

Next, because Ms. Shaffer relies on indirect evidence, her discrimination and retaliation claims will be analyzed under the familiar *McDonnell Douglas* burden-shifting framework.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364–65 (3d Cir. 2008) (applying *McDonnell Douglas* analysis to claims under the PDA); *see also* ECF No. 38 at 4 and ECF No. 43 at 4.  The analysis under *McDonnell Douglas* proceeds in three steps.  First, the plaintiff must first point to evidence sufficient to satisfy the elements of a prima facie case of employment discrimination or retaliation, thereby creating an inference that his or her employer acted unlawfully.  *See Burton*, 707 F.3d at 426.  Second, the defendant must rebut this inference by articulating a legitimate, non-discriminatory reason for its action(s).  *See id.*  Finally, the burden of production then shifts back to the plaintiff, who, in order to survive summary judgment, must provide evidence from which a jury could reasonably infer that the defendant's proffered explanation for its conduct is, in reality, pretext for unlawful discrimination.  *See id.* at 426–27;  *see also Fuentes v. Perskie*, 32 F.3d 759, 763–64 (3d Cir. 1994) (setting forth burden shifting framework under *McDonnell Douglas* at summary judgment).

## A.      Counts I and II – Disparate Treatment

Title VII prohibits discrimination by employers "because of [an individual's] race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Under the Pregnancy Discrimination Act ("PDA"),

> [t]he terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k).  According to the Supreme Court, the two clauses of this definition stand for two distinct propositions:  (1) that discrimination on the basis of sex encompasses pregnancy-based discrimination under Title VII and (2) that, in particular, an employer engages in sex-based discrimination when it treats pregnant employees less favorably than non-pregnant employees "similar in their ability or inability to work."  *See Young v. UPS,* 575 U.S. 206, 212 (2015).  In other words, although the PDA "'does not require that employers treat pregnant employees better than other temporarily disabled employees,' the PDA does require that employers treat pregnant employees no worse."  *C.A.R.S.*, 527 F.3d at 366 (quoting *In re Carnegie Ctr. Assocs*., 129 F.3d 290, 295 (3d Cir. 1997)).

Accordingly, to make out a prima facie claim of pregnancy discrimination, a plaintiff must establish that:  (1) plaintiff is or was pregnant and the employer had knowledge of plaintiff's pregnancy;  (2) plaintiff was qualified for the position at issue;  (3) plaintiff suffered an adverse employment action;  and (4) there was a nexus between plaintiff's pregnancy and the adverse employment action or the employer treated similarly situated non-pregnant employees more favorably than the plaintiff.  *See C.A.R.S.*, 527 F.3d at 365–66 (setting out elements of prima facie case under the PDA);  *Young*, 575 U.S. at 229 (modified prima facie case for claims based on

failure to provide a pregnant employee accommodations given to non-pregnant employees). Because, however, "[a] prima facie case cannot be established on a one-size-fits-all basis…'the nature of the required showing' to establish a prima facie case of disparate treatment by indirect evidence 'depends on the circumstances of the case,'" *C.A.R.S.* at 365 (citations omitted). Ultimately, therefore, "an individual plaintiff may establish a prima facie case by showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII." *Young,* 575 U.S. at 228.

### 1.    Adverse Employment Actions

Cranberry argues that "Ms. Shaffer did not suffer an adverse employment action as compared with other police officers who also received modified or light duty."  ECF No. 38 at 6. This is so, according to Cranberry, because Ms. Shaffer requested and received a light duty accommodation, just as other non-pregnant (but injured) officers had before her.  *See id.*  Ms. Shaffer responds that she can point to evidence of having suffered an adverse action because (1) the hours she was scheduled to work (and, as a result, her pay) dropped significantly after she went on light duty and (2) she requested, and was not provided, a regular, set schedule of 40 hours of light duty work each week.  *See* ECF No. 43 at 5–6.  Because the "adverse action" element asks only whether an employer's actions resulted in a real and material worsening of an employee's working conditions, without reference to the circumstances of other employees (whether or not those other employees are outside the protected class), the Court concludes that Ms. Shaffer can meet this element of her prima face case.

According to the Third Circuit, an adverse employment action is "'an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"  *U.S. EEOC v. Bob Evans Farms, LLC*, 275 F.Supp.3d

635, 659 (W.D. Pa. 2017) (Hornak, C.J, then J.) (quoting *Storey v. Burns Intern. Security Services*, 390 F.3d 760, 764 (3d Cir. 2004)).   While failure to hire, discharge, or changes in pay or compensation (as enumerated under 42 U.S.C. § 2000e-2(a)(1)) are the prototypical types of adverse employment action, and "a transfer to a less desirable position or an unsatisfactory job evaluation" may be sufficiently adverse "as to the terms, conditions, and privileges of employment" to support a Title VII claim, "modest changes in duties or working conditions and actions that simply make an employee unhappy but not producing a material disadvantage do not." *Bob Evans*, 275 F.Supp.2d at 659 (citing *King v. City of New Kensington*, Civ. Act. No. 06-1015, 2008 U.S. Dist. LEXIS 76485, 2008 WL 4492503, at *10 (W.D. Pa. Sept. 30, 2008), as amended (Oct. 3, 2008) (Conti, J.)); *see also Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F.Supp.2d 405, 430 (W.D. Pa. 2008) (Conti, J.) ("Adverse employment actions may include demotions, transfers to less desirable positions, and unsatisfactory job evaluations.") (citation omitted).   Consequently, as the court found in *Bob Evans*, even a modest reduction in hours (and, as a result, an hourly employee's compensation) can constitute an adverse employment action.   "Title VII does not contain a qualifier on the prohibition of discrimination in 'compensation,' such as requiring the loss of compensation to be 'substantial,' 'significant' or 'considerable.'"   *Bob Evans*, 275 F.Supp.3d at 662;   *see also* 42 U.S.C. § 2000e-2(a)(1).   As such, "a reduction of shifts, and its resulting reduction in compensation, will constitute an adverse employment action." *Id.* (citation omitted).

Here, the parties do not dispute that Ms. Shaffer worked less, and was scheduled for fewer shifts, after reporting her pregnancy than before.   Indeed, up until going on light duty, Ms. Shaffer steadily worked about 40 hours a week.  *See* ECF No. 40-12 at 74 ¶ 23 (Shaffer Deposition) (noting that full-time officers worked "84 hours a pay period").   Once she went on light duty, Ms. Shaffer

worked fewer shifts and fewer hours, resulting in a substantial decrease in her pay.  *See, e.g.,* ECF No. 49 at ¶ 56 (Cranberry's Response, showing Ms. Shaffer's actual hours worked while on light duty);  *see also* ECF No. 40-23 (Ms. Shaffer's light duty time sheets).  Furthermore, the parties do not dispute that (1) Ms. Shaffer sought a set schedule of shifts amounting to 40 hours per week of light duty work and that (2) Cranberry did not so accommodate her.  Based on these facts, whether viewed under the general PDA framework articulated by the Third Circuit in *C.A.R.S.*, or the more specific failure to accommodate rubric described by the Supreme Court in *Young*, Ms. Shaffer has pointed to evidence sufficient to establish the third element of her prima facie case for purposes of summary judgment.

### 2.    Failure to Provide Accommodations

Cranberry's Motion also challenges the fourth, and final, element of Ms. Shaffer's prima facie claim, arguing that Ms. Shaffer cannot meet her burden "to identify…comparators who were treated more favorably" than she was.  *See* ECF No. 38 at 10.  Ms. Shaffer responds that she can satisfy this element, and raise an inference of unlawful discrimination, because Cranberry "provided…similarly-situated officers significantly better light duty opportunities than it provided [Ms.] Shaffer."  ECF No. 43 at 10.

In general, a valid comparator for a Title VII claim must be "similarly situated [to the plaintiff] in all relevant respects."  *Parker v. Farley*, 625 Fed.Appx. 77, 82 (3d Cir. 2015) (citation omitted).  Factors relevant to this analysis include, but are not limited to, whether "'two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'"  *Id.* (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)).  However, according to the articulation of the prima facie provided by the Supreme Court in *Young*, where a plaintiff's claim is based on alleged differences

in work accommodations provided to pregnant and non-pregnant employees, the only relevant criteria in this analysis is whether the plaintiff and her alleged comparators were "'similar in their ability or inability to work.'"  575 U.S. at 229 (quoting 42 U.S.C. § 2000e(k));  *see also Durham v. Rural Metro Corp.*, 955 F.3d 1279, 1286–87 (11th Cir. 2020) ("[i]n contrast to Title VII's more general comparator analysis, 'the comparator analysis under the PDA focuses on a single criterion—one's ability to do the job.'") (citation omitted).

Although the Third Circuit has not yet addressed the comparator analysis under the PDA, the Eleventh Circuit's analysis in *Durham* is instructive.  The plaintiff in *Durham*, an emergency medical technician ("EMT"), requested to be assigned to "either light duty or dispatch."  *Durham*, 955 F.3d at 1282.  The court found that "[h]ere, as in *Young*, Durham's temporary inability to lift more than 50 pounds and her colleagues' inabilities to lift more than 10 or 20 pounds rendered Durham, and her colleagues, equally unable to perform the 100-pound lifting duties of an EMT." *Id.* at 1286.  Accordingly, "Durham and her colleagues who were injured on the job were 'similar in their ability or inability to work.'"  *Id.*  As such, like the Supreme Court in *Young*, the Eleventh Circuit concluded that the plaintiff could satisfy the final prong of the prima facie case under the PDA because the defendant failed to provide her with light duty accommodations it afforded other employees who were temporarily disabled.  *Durham*, 955 F.3d at 1286–87.

The same is true here.  It is undisputed that Ms. Shaffer and her alleged comparators—Officers Shields, Kobisteck, Evanson, and Roberts—were "similar in their ability or inability to work."  Specifically, all five officers, including Ms. Shaffer, were similar in their inability to perform many of the demanding physical duties police officers must engage in from time to time, like apprehending suspects, firing weapons, and similar duties.  Furthermore, they were all alike in their ability to perform the non-physical duties of a police officer, like preparing reports,

performing administrative or clerical tasks, or assisting with the radio, telephones, and walk-ins. Cranberry maintains that Ms. Shaffer lacked the experience or qualifications needed to perform certain duties (like burning DVDs for DUI cases), but this goes to whether Cranberry's proffered non-discriminatory reasons were pretext, not whether Ms. Shaffer can point to similarly abled, non-pregnant officers who Cranberry treated more favorably. *See, e.g.,* ECF No. 41 at ¶¶ 80-81. Thus, although the parties dispute whether Cranberry provided Ms. Shaffer with less generous light duty accommodations—in the form of the duties she was allowed to perform, the regularity of her schedule, and the number of hours available to her to work—than it gave to the other officers, the Court concludes that Ms. Shaffer has established this element of her prima facie case for purposes of summary judgment.

### 3.      Pretext

Cranberry last argues that Ms. Shaffer's claims in Count I and II fail because she cannot point to evidence from which a reasonable jury could conclude that Cranberry's proffered non-discriminatory reasons for its actions were pretextual. *See* ECF No. 38 at 14. Cranberry's "non-discriminatory reason for Ms. Shaffer's treatment is that it provided her with all of the work she was qualified to do based on her tenure with the Department, and that fit within her doctor's restrictions, and her own comfort level." *Id.* Ms. Shaffer responds that she should survive summary judgment because she can point to evidence that (1) supports her claim that Cranberry provided more generous light duty opportunities to nonpregnant officers and (2) would allow a jury to disbelieve Cranberry's proffered non-discriminatory reasons. *See* ECF No. 43 at 10–11.

Once the defendant has proffered a legitimate, non-discriminatory reason for its conduct, to defeat summary judgment the plaintiff in a Title VII case "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons;  or (2) believe that an invidious discriminatory reason was more

likely than not a motivating factor or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted).  In other words, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)." *C.A.R.S.*, 527 F.3d at 370.  To meet this burden, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken…[r]ather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531, 533 (3d Cir. 1992)) (emphasis original).

Viewing the evidence in the light most favorable to Ms. Shaffer, the Court finds that a reasonable jury could infer that Cranberry's stated non-discriminatory reasons are pretextual. First, under *Young,* a plaintiff may show pretext by pointing to evidence "showing the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers."  575 U.S. at 229–30.  Here, Ms. Shaffer has done so by pointing to evidence that Cranberry consistently provided non-pregnant officers on light duty with regular schedules and that those officers had more light duty hours available to them to work than Ms. Shaffer did.

Furthermore, Ms. Shaffer points to contradictions and inconsistencies that could lead a reasonable factfinder to disbelieve Cranberry's proffered nondiscriminatory reasons.  For example, Ms. Shaffer notes that Cranberry's argument that Ms. Shaffer's duty restrictions were a "moving target," *see* ECF No. 38 at 12, finds no support in the record and that, in fact, Ms. Shaffer had one

list of restrictions for the entire duration of her light duty.  Indeed, a reasonable jury could conclude that, apart from Ms. Shaffer's testimony that she was not comfortable with being in uniform while five months pregnant, it appears that Chief Meyer's comfort level, rather than Ms. Shaffer's, was the determinative factor in whether Ms. Shaffer would be allowed to perform certain duties within her doctor's restrictions.  *See, e.g.* ECF No. 41 at ¶¶ 80 (burning DUI DVDs), 89 (PICS investigations).  And, with respect to PICS investigations, while Chief Meyer took those assignments away from Ms. Shaffer, Cranberry stated in its discovery responses that Officer Shields, whose physical restrictions were similar to Ms. Shaffer's, performed such tasks during his light duty term.  *See* ECF No. 49 at ¶¶ 83–85.  Next, Ms. Shaffer points out that "the availability of consistent light duty work for every officer other than [Ms.] Shaffer could easily cause a jury to disbelieve Defendant's claim that such work was simply not available for her."  *See* ECF No. 43 at 13.  Indeed, Ms. Shaffer points to evidence that the department was busier during her time on light duty than it was when her alleged comparators were on light duty.  *See* ECF No. 49 at ¶ 86. Furthermore, Ms. Shaffer points to evidence that Officers Shields and Roberts were both scheduled for consistent 20 hour weeks when their light duty periods overlapped and, once Officer Roberts returned to regular duty, Officer Shields' light duty schedule increased to a consistent 40 hours per week.  *See id.* at ¶¶ 76–78.  The Court concludes that Ms. Shaffer has met her burden to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Cranberry's proffered non-discriminatory reasons such that a reasonable jury "*could* rationally find them 'unworthy of credence.'"  *Fuentes*, 32 F.3d at 765 (citation omitted); *see also id.* at 764 n.7 (noting that a plaintiff need not "cast doubt on each proffered reason in a vacuum" because doubt as to some of a defendant's reasons could undermine a defendant's credibility enough to

permit a factfinder to disbelieve all of a defendant's reasons).  Accordingly, Cranberry's Motion will be denied with respect to Counts I and II.

### B.     Counts III and IV – Retaliation

Cranberry argues that Ms. Shaffer's retaliation claims in Counts III and IV should be dismissed because, according to Cranberry, Ms. Shaffer cannot "set forth any adverse employment action" sufficient to support a prima facie case of retaliation or, in the alternative, she cannot point to evidence sufficient to establish pretext.  *See* ECF No. 38 at 17.

To establish a prima facie case of retaliation under Title VII, "a plaintiff must tender evidence that:  '(1) she engaged in activity protected by Title VII;  (2) the employer took an adverse employment action against her;  and (3) there was a causal connection between'" the protected activity and the adverse action.  *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  Notably, the "adverse action" element of a Title VII retaliation claim need not rise to the level required for a disparate treatment claim.  *Id.* at 341 ("'[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'") (citation omitted). Instead, in the retaliation context, the plaintiff need only point to evidence of retaliatory conduct "that a reasonable employee would have found [to be]…materially adverse" such that that she would have been dissuaded from making or supporting a charge of discrimination.  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

In opposition, Ms. Shaffer points out that "before the meeting where the parties discussed [Ms.] Shaffer's EEOC charge, she worked an average of **29.7** hours per week."  ECF No. 43 at 17 (citing ECF No. 40-23 at 3–7) (emphasis original).  After the meeting, however, Ms. Shaffer "worked an average of **14.9** hours per week" for the remainder of her light duty.  *Id.* (citing ECF

No. 40-23 at 8–28) (emphasis original).  Indeed, Ms. Shaffer notes that she only worked seven hours in the week immediately following the July 26, 2018, meeting.  *See id.* (citing ECF No. 40-23 at 8).  Ms. Shaffer also points out that at the July 26 meeting—which occurred just two weeks after Cranberry received notice of Ms. Shaffer's EEOC charge—Chief Meyer told Ms. Shaffer that "she could no longer do fingerprinting, PICS cases, walk-ins, or phone calls," all of which she had been previously cleared to do.  *Id.*;  *see also, e.g.,* ECF No. 40-3 (June 22, 2018, letter informing Ms. Shaffer she had "been cleared to perform finger printing detail as it is scheduled.").

Viewing the facts in the light most favorable to Ms. Shaffer, the Court concludes that Ms. Shaffer has established that, for purposes of summary judgment, she was subjected to "materially adverse" employment actions sufficient to deter a reasonable employee from making or supporting a charge of discrimination.

With respect to pretext, the undisputed evidence that Chief Meyer did not impose additional restrictions on the scope of Ms. Shaffer's light duty assignments until after receiving notice of Ms. Shaffer's EEOC charge, coupled with evidence proffered by Ms. Shaffer that other officers on light duty were permitted to perform duties such as PICS investigations, could lead a reasonable jury to conclude that Cranberry's articulated non-discriminatory reasons for further restricting Ms. Shaffer's duties were, in fact, pretextual.  Likewise, Ms. Shaffer has pointed to evidence that despite her invocation of the CBA's two-week provision Chief Meyer could have continued to schedule her to fill-in for other employees who called off on a given day.  *See* ECF No. 49 at ¶¶ 64–65.  As such, a reasonable jury could find Chief Meyer's explanation for further reducing Ms. Shaffer's hours not credible.  As such, Cranberry's Motion with respect to Counts III and IV will be denied.

### C.  Punitive Damages

Finally, the parties agree that Cranberry, as a municipality, is immune from claims for punitive damages.  *See* ECF No. 38 at 19 ("It is well-settled that a municipality is immune from punitive damages") (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)); ECF No. 43 at 21 ("Defendant correctly notes that municipalities are immune from punitive damages.").  As such, and because Ms. Shaffer withdraws her request for punitive damages, *see* ECF No. 43 at 21, Cranberry's Motion on this point will be granted.

## IV.   Conclusion

For the foregoing reasons, Defendant Cranberry Township's Motion for Summary Judgment will be GRANTED to the extent Cranberry seeks dismissal of Ms. Shaffer's request for punitive damages.  Cranberry's Motion will be DENIED in all other respects.

DATED this 8th day of October, 2021.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record

21